# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **ANTHONY NATALE, JR.**, on behalf of himself and all others similarly situated,<br><br>         **Plaintiff**,<br><br>   v.<br><br>**GENERAL MOTORS CORPORATION,**<br><br>         **Defendant**. | CIVIL ACTION<br>NO.  05-11152-RCL |

## DEFENDANT GENERAL MOTORS CORPORATION'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S COMPLAINT

## I.    INTRODUCTION

On May 6, 2005, plaintiff served the defendant General Motors Corporation ("GM") with a First Amended Class Action Complaint (the "Amended Complaint").  On June 3, 2005, GM removed the action to this Court.  GM now moves to dismiss pursuant to Rule 12(b)(6) because the complaint fails to state valid claims, and pursuant to Rule 12(b)(5) and Mass. R. Civ. P. 4(j) because of insufficiency of service of process.

This suit represents a second attempt by the firm of Gilman and Pastor, LLP to initiate a class action related to rumored product issues with DEX-COOL engine coolant with respect to every GM vehicle sold in the Commonwealth since 1994.  Counsel does so even though (1) not a single consumer alleges that he or she has actually experienced any product failure, and (2) in August 2004, the Massachusetts Superior Court in Middlesex County dismissed a virtually identical complaint nominally filed on behalf of Erin Corkery, a secretary employed by Gilman and Pastor.  *See* Memorandum of Decision and Order on Defendant's Motion to Dismiss, *Corkery v. General Motors Corp.*, Civ. Action No. 03-03881 (Middlesex Super. Ct. Aug. 2, 2004) (Gershengorn, J.) ("*Corkery*").  A copy of *Corkery* is attached hereto as Ex. A.

Counsel opted not to appeal *Corkery*. Instead, on February 11, 2005, and on behalf of a different plaintiff, Anthony Natale, Jr. ("Natale"), Gilman and Pastor filed an essentially identical complaint, this time in the Essex County Superior Court (the "Complaint"). Of course, the proper response to the *Corkery* decision, assuming a desire to challenge it, was to appeal and not to file an identical complaint in a different county with a different named plaintiff, obviously in hopes of a different result.[1] In all events, like Erin Corkery, Natale claims to be the owner of a GM vehicle allegedly equipped, when new, with DEX-COOL engine coolant. Like Corkery, Natale also alleges that DEX-COOL generally fails to perform as designed and can cause a laundry-list of various engine defects. Most significantly, also like Corkery, Natale does not allege that his own vehicle has experienced any such problems. Simply put, the allegations have not changed, only the identity of the named plaintiff and the chosen venue.

As the Judge Gershengorn ruled in *Corkery*, where, as here, vehicle safety is not implicated, the failure to allege that a defect has actually manifested in the subject vehicle is, by itself, grounds to dismiss the complaint. For the reasons set forth in *Corkery*, as well as the reasons set forth below, the Complaint should be dismissed, with prejudice.

The case should also be dismissed for insufficient service of process under Mass. R. Civ. P. 4(j). *See* Fed. R. Civ. P. 12(b)(5). In this regard, the February 11 filing of the Complaint, just days before the Class Action Fairness Act ("CAFA") took effect, is significant. Presumably, the

---

[1] In the face of the Court's dismissal in *Corkery*, there is a serious question as to whether there was a good faith factual or legal basis for the filing of an identical complaint in a different county on behalf of new plaintiff. See Mass. R. Civ. P. 11. To the extent counsel were to assert that the Superior Court's decision in *Corkery* is not binding precedent which does not or should not preclude the filing of an identical lawsuit in a different county, such logic would essentially allow counsel free reign to file serial complaints in each County across the Commonwealth hoping to eventually obtain a different result. A pattern of repetitive, abusive litigation surely would violate Mass. R. Civ. P. 11 (requiring attorney to certify that there is "good ground to support [the pleading] and it is not interposed for delay"). Also, unlike *Corkery* where the allegation of proper venue in Middlesex County was based on plaintiff's place of residence, here, the allegation of proper venue is that GM "has transacted business in Essex County" (Cplt. ¶ 7), an allegation certainly indicative of a desire by counsel to forum shop.

LITDOCS/604065.4

Natale Complaint was filed on February 11 to avoid the effect of CAFA. Massachusetts R. Civ. P. 4(j) requires, however, that service of a complaint be made within 90 days or, unless good cause is shown or extension granted, the complaint <u>shall</u> be dismissed. Undoubtedly for some perceived strategic reason, counsel chose not to serve the Natale Complaint on GM.[2] Instead, on May 6, 2005, shortly before the time for service under Rule 4(j) expired, plaintiff served on GM an amended complaint (the "Amended Complaint"). The Amended Complaint, which adds another plaintiff, John Burns,[3] was not previously filed with the Superior Court. As of Friday, June 3, 2005, when the action was removed to this Court, the Amended Complaint still had not been filed. Because (i) the only Complaint filed with the Essex County Superior Court was not served within 90 days as required by Mass. R. Civ. P. 4(j), (ii) no extension was granted, and (iii) plaintiff cannot demonstrate good cause for lack of timely service, Rule 4(j) requires that the case be dismissed, albeit without prejudice.

---

[2] Counsel certainly cannot blame the lack of service on inadvertence since the existence of the Natale Complaint and the fact that it had not been served was noted in a March 3, 2005 submission to the Middlesex Superior Court in the matter of *Ann DiTondo v. General Motors Corp.*, Civ. Action No. 01-3578, another putative class action brought by the same firm.

[3] For simplicity's sake, GM refers to "plaintiff" in the singular throughout this motion, both because the only complaint pending in Essex Superior Court is the original complaint and the additional plaintiff, John Burns, makes the exact allegations as Natale, except that Burns fails to allege ownership of a particular GM model, stating only that he "purchased and owns a GM vehicle." (Am. Cplt. ¶ 5). GM notes, however, that the identity of the plaintiff(s) and the circumstances surrounding their vehicles may be extremely important for issues related to class certification and may explain why Burns was added. Indeed, as best as GM can determine, Natale is a resident of Middlesex, not Essex County (further indication of a desire to forum shop) and is the registered owner of 1994 Chevrolet Blazer. It appears that Natale purchased this vehicle used in April, 2004 (with 128,000 miles) and not new from a GM dealership (calling into question the veracity of a host of allegations, including the allegations concerning the alleged warranty at the time of purchase based on statements in the owners manual). (Am. Cplt. ¶ 19). More significantly, because GM's use of DEX-COOL in its new vehicles began in the spring of 1995, it is almost certain that Natale's 1994 model year vehicle was not equipped with DEX-COOL when it was sold as new. The fact that the Court entered summary judgment on April 20, 2005 in favor of GM in *Ann DiTondo v. General Motors, Corp.*, Civ. Action No. 01-3578, in part, because of issues related to the identity and status of the named plaintiffs, is further explanation why Burns was added as a named plaintiff prior to service on GM on May 6.

- 3 -

## II.    BACKGROUND

### A.    The Filing and Service of the Lawsuit.

On February 11, 2005, Natale filed the Complaint, entitled *Anthony Natale, Jr. on behalf of himself and all others similarly situated v. General Motors Corporation*, in the Essex County Superior Court.  Affidavit of Carol E. Head, ("Head Aff.") at Ex. A.  The deadline for service under Mass. R. Civ. P. 4(j) was May 12, 2005.  *See also* Superior Court Tracking Order, Head Aff., at Ex. B.  The Complaint was never served on GM.  Affidavit of Lawrence S. Buonomo, ¶ 3 ("Buonomo Aff.").  Indeed, on May 6, 2005, the <u>Amended Complaint</u>, captioned *Anthony Natale, Jr. and John Burns on behalf of himself and all others similarly situated v. General Motors Corporation* was served on GM.  Buonomo Aff., at Ex. A.  The Amended Complaint was served with a summons captioned, *Anthony Natale, Jr. et als., on behalf of themselves and all others similarly situated v. General Motors Corporation*.  Buonomo Aff., at Ex. B.  While the summons was filed in Essex County Superior Court on May 6, 2005, the Amended Complaint was not.  *See* Essex County Superior Court docket, Head Aff., at Ex. C.  At no time did GM waive service under Rule 4(j).  Buonomo Aff., ¶ 5.

### B.    The Allegations Contained in the Complaint.

#### 1.    Natale Makes the Same Allegations as Erin Corkery.

In both the Complaint and the Amended Complaint, Natale makes the same allegations as Erin Corkery.[4]  First, he claims to own a GM vehicle, which was originally equipped with DEX-

---

[4] The Complaint (and the Served Amended Complaint) in this case and the First Amended Class Action Complaint in *Corkery* are virtually identical, except that: (1) Natale does not state a claim under c. 93A; (2) Natale's putative class begins with model year 1994 (Corkery's began with 1996); (3) Natale's complaint was filed in Essex County (Corkery's was filed in Middlesex); (4) Natale allegedly owns a Chevy Blazer (Corkery allegedly owned a Chevy Malibu); and (5) the basis for venue in Massachusetts was that GM conducted business in Essex County, not that Natale lived there (Corkery claimed to live in Middlesex County).  Natale's Amended Complaint served, but not filed, differs from the Complaint only in that it adds another plaintiff, John Burns, a resident of Middlesex.

COOL engine coolant.[5]  (Cplt. ¶ 4, Am. Cplt. ¶ 4).  He also makes the general allegation that DEX-COOL coolant "failed to protect GM engines against corrosion," causing "rusty sludge," amongst other things, requiring replacement and repair of certain various engine parts.  (Cplt. ¶ 21, Am. Cplt. ¶ 22).  Like Corkery, he does not allege, however, that any such failures have actually manifested in his (or any of the class members') vehicles.  Instead, and again like Corkery, Natale claims to have suffered an unspecified "diminution in value," even though he does not allege that he has sold his vehicle or otherwise experienced an "actual" loss of value.  Similarly, Natale also does not allege that he ever presented his vehicle for warranty-related repairs, as required by the GM written warranty.

### 2.    GM' New Vehicle Warranty and the Vehicle Owner's Manual.

Like Corkery's, Natale's vehicle came with a GM limited written warranty when purchased new.  The limited warranty, described in a booklet provided to each initial purchaser, affords a "bumper-to-bumper" warranty for the earlier of a specified number of months or miles (typically the earlier of 36 months or 36,000 miles), subject to certain exceptions as explained in the warranty booklet.[6]  One of those exceptions is for damage due to insufficient or improper maintenance.  (*See* Ex. B, at 10).  The new vehicle warranty does not specifically address the cooling system or the coolant, other than to include those items generally within the limited bumper-to-bumper warranty.  Nevertheless, Natale claims that his "vehicle [was] covered by the manufacturer's warranties, which included statements about DEX-COOL engine coolant."  (Cplt.

---

[5] The information concerning Mr. Natale and his vehicle that GM has been able to develop so far, namely that Natale owns a 1994 Chevrolet Blazer with more than 128,000 miles which appears to have been purchased in April 2004, raises a very serious question as to veracity of all of the fundamental allegations of the Complaint as they apply to Natale.

[6] The Complaint repeatedly refers to and, in part, incorporates the vehicle owner's manual and written warranty.  (Cplt. ¶¶ 3, 19-21, 32-33).  Although Natale does not allege a model year, for convenience, exemplars of both documents (for a 1999 Chevy Blazer) are attached as Exhibits B (warranty booklet) and C (GM Owner's Manual) (relevant excerpts).  Documents "referenced in the Complaint" may be considered in connection with a motion to dismiss under Fed. R. Civ. P. 12(b)(6).  *See Beddall v. State Street Bank and Trust Co.*, 137 F.3d 12, 16 (1st Cir. 1998).

at 18). The alleged DEX-COOL "warranty", however, is not the "bumper to bumper" written warranty but, rather, certain maintenance instruction statements found in the owner's manual and on a sticker affixed to the engine.

Natale, like Erin Corkery, claims that the single sentence in the owner's manual explaining that DEX-COOL is *designed* to last the earlier of five years or 150,000 miles when only DEX-COOL coolant is used constitutes an enforceable written warranty of future performance. The manual states in part:

> The cooling system in your vehicle is filled with DEX-COOL engine coolant. This coolant is designed to remain in your vehicle for 5 years or 150,000 miles (240,000 km) whichever occurs first, if you add only DEX-COOL extended life coolant. The following explains your cooling system and how to add coolant when it is low. If you have a problem with engine overheating, see "Engine Overheating" in the Index.

(Ex. C, at 6-24). The manual further explains the procedure for adding or replacing the vehicle's coolant, cautioning that only a mixture containing DEX-COOL coolant should be used when adding or replacing the vehicle's coolant, and that damage caused by a coolant other than DEX-COOL is not covered by the limited written warranty. (*Id.* at 6-25). The manual also instructs vehicle owners to check regularly the coolant level, to add the appropriate mixture of coolant if necessary, and that operating the engine at a low coolant level is harmful and not covered by the vehicle's warranty. (*Id.* at 7-40). Thus, the owner's manual does not warrant that the coolant will not need to be replenished or replaced within the five year/100,000 or 150,000 mile period, or that the coolant level and cooling system need not be maintained during that time. The statements, in plain English, simply inform the owner that DEX-COOL was designed to last longer than the previously used silicate-based coolants and that the owner should use only DEX-COOL when adding or replacing the vehicle's coolant.

**C.     The Massachusetts Superior Court Dismissed the Very Same Claims Based on the Very Same Allegations in *Corkery v. General Motors Corporation*.**

As noted, by decision dated August 2, 2004, the Massachusetts Superior Court dismissed identical claims based on identical allegations brought by the same counsel. *See Corkery*,

Exhibit A.  Because she did not allege that her vehicle had exhibited any actual failure, the Court dismissed Corkery's breach of warranty and Chapter 93A claims.  The Court did so because it recognized that "most courts require that a plaintiff allege that his or her product is defective or has malfunctioned in order to recover for breach of warranty."  *Id.* at 5.  By dismissing the complaint filed in *Corkery*, Massachusetts joined an overwhelming majority of courts in rejecting allegations premised upon the mere potential that a product may malfunction.  *See id.* at 5-6, *citing Briehl v. General Motors Corp.*, 172 F.3d 623, 627-28 (8th Cir. 1999) ("courts have been particularly vigilant in requiring allegations of injury or damages").

Judge Gershengorn also dismissed the same breach of the implied warranty of merchantability claim asserted by Natale, noting that the implied warranty of merchantability is not "intended to guarantee high quality or perfection of detail."  *See Corkery*, Exhibit A, at 9-10, *citing Tracy v. Vinton Motors, Inc.*, 130 Vt. 512, 516 (1972).  Indeed, *Corkery* held that "[t]here is no implied warranty that the goods shall be of the best or even a very high quality."  *Id.* at 10, *citing Hannon v. Original Gunite Aquatech Pools Inc.*, 385 Mass. 813, 822 (1982); H. Alperin & R. Chase, Consumer Rights & Remedies § 68, at 158 (1979).  Looking to similar cases, Judge Gershengorn noted that:

> The implied warranty of merchantability does not impose a general requirement that goods precisely fulfill the expectations of the buyer.  Instead, it provides for a minimum level of quality – that the goods 'are fit for the ordinary purpose for which such goods are used' . . . .  Automobiles are designed for driving, and therefore the question in this case is whether the GM vehicles were fit for that purpose.

*Id.* at 10, *quoting Skelton v. General Motors Corp.*, 500 F. Supp. 1181, 1191-92 (N.D. Ill. 1980), *rev'd on other grounds*, 660 F.2d 311 (7th Cir. 1981).  Observing that Corkery had failed to allege that the coolant was unfit for use as a coolant, that it fell below minimally acceptable standards of quality, that the vehicle was unfit for driving, or that the car was unreasonably dangerous due to the defective coolant, Judge Gershengorn dismissed Corkery's claim for breach of the implied warranty of merchantability.  *Id.* at 10-11.

- 7 -

## III.    ARGUMENT

**A.    Pursuant to Fed. R. Civ. P. 12(b)(5), this Action Must be Dismissed for Insufficiency of Service of Process Under Mass. R. Civ. P. 4(j).**

Massachusetts R. Civ. P. 4(j) requires that that service of a complaint be made within 90 days or, unless good cause is shown or an extension is granted, the complaint shall be dismissed without prejudice.  Under Fed. R. Civ. P. 12(b)(5), a federal court must apply state procedural law regarding the service of process that occurred prior to removal to federal court.[7]  *See Osborne v. Sandoz Nutrition Corp.*, 1995 U.S. App. Lexis 28008 (1st Cir. 1995) (unpublished) (affirming dismissal of removed action for failure to serve within Mass. R. Civ. P. 4(j)'s 90 day limit); *Garden Homes, Inc. v. Mason*, 238 F.2d 651, 654 (1st Cir. 1956) (applying Massachusetts law to determine if service was sufficient on removed case).  To do otherwise would "ignore [plaintiff's] procedural deficiency in state court, and effectively penalize [defendant] for exercising its removal right."  *Osborne*, 1995 U.S.App. Lexis 28008 at *5.  Once challenged, plaintiff bears the burden of proving proper service.  *Rivera-Lopez* v. *Municipality of Dorado*, 979 F.2d 885, 887 (1st Cir. 1992).

Rule 4(j) is unforgiving, but its overall effect is not harsh.  Dismissal is mandatory unless good cause is shown or an extension of time is allowed.  Also, while good cause is "a  stringent standard," dismissal is without prejudice.  *Commissioner of Revenue v. Carrigan*, 45 Mass. App. Ct. 309, 312 (1998); *Hull v. Attleboro Sav. Bank*, 33 Mass. App. Ct. 18, 26 (1992).  Here, service was not made within the 90 day time period, and plaintiff cannot demonstrate good cause because that requires a "diligent albeit unsuccessful effort to complete service within the period

---

[7] This court may decide a Fed. R. Civ. P. 12(b)(5) motion to dismiss before determining whether removal is appropriate.  *Cf. Garden Homes, Inc. v. Mason*, 238 F.2d 651, 654 (1st Cir. 1956) ("district court [may] be free to dispose of the [removed] case upon whichever of the two grounds may appear to it to be more convenient").  Otherwise, GM must litigate the issue of removal in a case that, were it remanded, will be dismissed in state court. *See Walker v. Savell*, 335 F.2d 536, 539 (5th Cir. 1964) (court may examine service of process motion immediately not to subject defendant to further hearing in a state court on question of personal jurisdiction).

prescribed by the rule." *Hull*, 33 Mass. App. Ct. at 26. Prejudice is "not the proper inquiry," and later service is "irrelevant" to whether plaintiff complied with the rule. *Id.* at 26 & n.10. Massachusetts appellate courts have cited only one example of good cause: "the obvious one of a defendant's evasion of service." *Carrigan*, 45 Mass. App. Ct. at 312 (citation omitted). Here, GM had a registered agent available to accept service and, as noted, referenced the lack of service in a March 3, 2005 submission in the *DiTondo* case.

Further, Massachusetts courts have explained that "[t]he rule's entire focus [is] to force plaintiffs' (more realistically their lawyers') diligence in order to preserve causes of action against limitations problems." *Id.* (citation omitted). That a plaintiff tried multiple times to serve a defendant, but failed, does not demonstrate good cause. *See id.* at 313-15. It does not matter that a constable failed to effectuate service, *Shuman* v. *The Stanley Works*, 30 Mass. App. Ct. 951, 953 (1991), that a plaintiff's claim is now barred by the statute of limitations, *id.* at n.3, or that counsel, while changing offices and staff, unknowingly filed a copy of the amended complaint with the motion to amend, thus accelerating the time table for service. *Bratica* v. *Miller*, 1999 Mass. Super. LEXIS 370 *7-8 (Sept. 29, 1999).

In this case, and given the March 3, 2005 reference in *DiTondo*, there appears to have been a conscious decision not to serve GM with the Complaint, not to seek an extension of time, and not to request that GM waive the service requirements of Rule 4(j). In fact, the February 11, filing appears to be part of a strategy to avoid the effect of CAFA, 28 U.S.C. § 1332, which took effect on February 18, 2005. CAFA, of course, grants federal courts original jurisdiction over certain civil class action lawsuits filed under federal or state law. 28 U.S.C. § 1332(d). Further, John Burns presumably was added as a plaintiff for strategic reasons. Finally, the Amended Complaint was never filed with the Superior Court, either before or after it was served.[8]

---

[8] Although a complaint may be served before it is filed, s*ee Finkel v. Natale Rota, Inc.*, 19 Mass. App. Ct. 55, 58 (1984) (complaint need not be filed before service, but the date of service should be deemed the date the action is commenced), the time period for defendant to remove begins with service of process. The U.S. Supreme Court has refused to interpret the removal statute to

(Footnote Continued on Next Page.)

Whatever plaintiffs' reasons, they do not amount to good cause under Rule 4(j).  *See Carrigan*, 45 Mass. App. Ct. at 312 (simple inadvertence is not good cause).  Because (1) the complaint was never served and (2) plaintiff cannot demonstrate good cause for the failure to comply with Rule 4(j), the action must be dismissed.  *See id.*

**B.    Pursuant to Fed. R. Civ. P. 12(b)(6), this Action Must be Dismissed for Failure to State a Claim Upon Which Relief may be Granted.**

**1.    Plaintiff's Warranty Claims are Defective on Their Face Because They Fail to Allege a Manifested Defect, any Injury, or any Actual Damages.**

Although the Complaint makes general allegations concerning DEX-COOL, Natale does not allege that his vehicle has actually suffered any legally cognizable injury or damage.  If Natale (or Burns) encountered any such problems, they would have been alleged in the Complaint.  As noted, the overwhelming weight of authority from federal and state courts around the country rejects automotive product defect claims based on alleged unmanifested defects creating no actual injury or damages in fact.  *See e.g., Briehl*, 172 F.3d at 626 (affirming dismissal with prejudice of a putative class action seeking to recover for an alleged latent design defect in anti-lock brakes); *Tietsworth v. Harley-Davidson, Inc.*, 677 N.W.2d 233, 240-241 (Wisc. 2004) ("many federal and state court decisions [] have affirmed the dismissal of claims brought under fraud, strict products liability and other tort theories where the allegedly defective product has not actually malfunctioned") (collecting cases).  Indeed, the *Briehl* Court noted that courts nationwide "have been particularly vigilant in requiring allegations of injury or damages in products liability cases.  *Briehl*, 172 F.3d at 627-28.  *See also In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.*, 288 F.3d at 1017 & n.1 (7th Cir. 2002) (district court erred in allowing "no injury" latent defect claims to proceed for vehicle purchasers whose tires had not failed to

---

(Footnote Continued from Previous Page.)

allow a plaintiff to "dodge" service requirements and "trap" defendants "into keeping their suits in state courts."  *Murphy Bros. Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 355-56 (1999).  Similarly, a plaintiff cannot avoid removal by serving a complaint, but then not filing it until the defendant's removal rights had expired.  *See id.*

work properly); *Chin v. Chrysler Corp.*, 182 F.R.D. 448, 460 (D.N.J. 1998) ("In most jurisdictions, the courts recognize that unless a product actually manifests the alleged defect, no cause of action for breach of express or implied warranty or fraud is actionable.") (collecting cases). Judge Gershengorn explicitly adopted this reasoning in dismissing *Corkery*: "This Court agrees with the role adopted in [*Briehl*] and will apply it in this case. Put simply, a manufacturer does not breach a warranty if the product performs as warranted and does not exhibit the alleged defect."[9] *Corkery*, Exhibit A, at 6.

Just as in *Corkery*, the Complaint here makes no allegations of physical harm, property damage, or expenditures to repair, replace, or inspect the coolant system or engine. (Cplt. ¶¶ 3, 21). Rather, the sole allegation of injury is an unspecified "diminution in value." (*Id.* at 21). As such, the warranty claims should be dismissed.

---

[9] *Briehl* and *Bridgetsone/Firestone* - adopted in *Corkery* - reflect a virtual consensus among courts nationwide that warranty claims cannot exist where the alleged product defect has not manifested itself in the form of an actual product malfunction and has not caused any personal injury, property damage, or actual harm. *See, e.g., Haenisch v. General Motors Corp.*, Nos. 2001 WL 103434, at 2 (N.D. Ill. Jan. 31, 2001); *In re Air Bag Prods. Liab. Litig.*, 7 F. Supp. 2d 792, 804 (E.D. La. 1998); *Weaver v. Chrysler Corp.*, 172 F.R.D. 96, 99 (S.D.N.Y. 1997) ("[w]ell established that purchasers of an allegedly defective product have no legally recognizable claim where alleged defect has not manifested itself in the product they own"); *In re Ford Motor Company Ignition Switch Prods. Liab. Litig.*, 174 F.R.D. 332, 353 (D.N.J. 1997); *Lee v. General Motors Corp.*, 950 F. Supp. 170, 174-75 (S.D. Miss. 1996); *Martin v. Ford Motor Co.*, 914 F. Supp. 1449, 1454-56 & n.9 (S.D. Tex. 1996); *Feinstein v. Firestone Tire & Rubber Co.*, 535 F. Supp. 595, 602-03 (S.D.N.Y. 1982); *Hubbard v. General Motors Corp.*, 1996 WL 274018, at *3 (S.D.N.Y. May 22, 1996); *Barbarin v. General Motors Corp.*, 1993 WL 765821, at *2 (D.D.C. Sept. 22, 1993); *Yost v. General Motors Corp.*, 651 F. Supp. 656, 657-58 (D.N.J. 1986) (alleging defect "likely to cause" damage failed to state a claim); *Ziegelmann v. DaimlerChrysler*, 649 N.W.2d 556, 565 (N.D. 2002); *Wallis v. Ford Motor Co.*, 2005 Ark LEXIS 301 (Ark. 2005); *Ford Motor Co. v. Rice*, 726 So. 2d 626, 631 (Ala. 1998); *American Suzuki Motor Corp. v. Superior Ct.*, 44 Cal. Rptr. 2d 526, 531-2 (Cal. Ct. App. 1995); *Dalton v. Ford Motor Co.*, 2002 WL 338081, at **5-7 (Del. Super. Ct. Feb. 28, 2002). *See also Aspinall v. Philip Morris Cos.*, 442 Mass. 381, 399 (2004) (rejecting, in context of c. 93A claim, a theory of harm based on 'fraud on the market' and requiring actual damages); *Thiedemann v. Mercedes Benz USA, Inc. LCC*, 872 A.2d 783, (N.J. 2005) (dismissing complaint where notwithstanding an actual vehicle failure, there was no evidence of ascertainable loss because the condition was repaired by the manufacturer).

The implied warranty claims fare no better. Massachusetts law requires an implied warranty claim to allege "that the product, as sold, is not fit 'for the ordinary purpose for which such [product] are used.'" *Corkery*, Exhibit A, at 9, *citing* G.L. c 106, § 2-314 and *Hannon*. *See also Hannon*, 385 Mass. at 822, *quoting Tracy*, 130 Vt. at 516 ("'[t]he implied warranty of merchantability, (however), like that of fitness, is primarily directed at the operative essentials of a product. . . . It is not intended to guarantee a high quality or perfection of detail.'"). Massachusetts does not require that an automobile be "perfect" and otherwise free from any defect or the need for potential future repairs. Instead, an implied warranty claim must, at a minimum, claim that the alleged defect substantially impair plaintiff's use of the product or make use of the product unreasonably dangerous.[10] Given his fully functioning automobile, Natale cannot do so. Based on the very same allegations, Judge Gershengorn found that Corkery had not alleged, nor could she allege in good faith, "that Dex-Cool is unfit for use as a coolant, that it falls below some minimally accepted standard of quality, that the vehicle is unfit for driving, or that the car is unreasonably dangerous with the defective coolant." *Corkery*, Exhibit A, at 10.[11] Other jurisdictions concur. *See, e.g., In re General Motors Corp. Anti-Lock Brake Products Liab. Litig.*, 966 F. Supp. 1525, 1533 (E.D. Mo. 1997), *aff'd sub nom. Briehl*, 172 F.3d 623; *Carlson v. General Motors Corp.*, 883 F.2d 287, 297 (4th Cir. 1989). S*ee also Skelton*, 500 F Supp. at 1191-92. Based on the allegations and claims set forth in the Complaint, GM cannot be found to have breached written warranty, let alone an implied warranty of merchantability. Counts I, II and II should be dismissed.

---

[10] *See also* 35 Mass. Prac. Consumer Law § 6:47 (2d ed.) ("if a used car is substantially free of defects and can provide safe, reliable transportation, it is merchantable, regardless of defects that may develop in time or are repairable or do not affect the performance of the car").

[11] *Compare Holtzman v. General Motors Corp.*, 2002 WL 1923883 (Mass. Super. July 2, 2002) (denying motion to dismiss for alleged defect that could cause substantial physical injury, death or was otherwise unmerchantable) *with Corkery*, Exhibit A, at 8-9 (allowing motion to dismiss because DEX-COOL is not alleged to be unreasonably dangerous or unfit for use as a coolant).

2.    **The Statement in the Vehicle Owner's Manual Regarding DEX-COOL is not a Warranty Under Massachusetts Law or the Magnuson-Moss Act.**

In *Corkery*, Judge Gershengorn did not reach the issue of whether the statements in the Owner's Manual constitute a written warranty since she dismissed all of the asserted warranty claims as being "premature" absent a manifested injury. *Corkery*, Exhibit A, at 6-7. Even if the Court considers the warranty claims without a manifested injury requirement, the Owner's Manual statements simply do not constitute an actionable warranty and thus should be dismissed.

a.    **A Written Warranty Must Promise a Specified Level of Future Performance.**

The Magnuson-Moss Act (Count IV) defines a "written warranty" as a: (i) written affirmation of fact or written promise; (ii) made in connection with the sale; (iii) of a consumer product; (iv) by a supplier to a buyer; (v) which relates to the nature of the material or workmanship; and (vi) affirms or promises that such material or workmanship is defect free or will meet a specified level of performance over a specified period of time. 15 U.S.C. § 2301(6)(A) (2003).[12] The Magnuson-Moss Act's definition of "written warranty," requires both a "written affirmation of fact or written promise…which relates to the nature of the material" *and* an "affirm[ation] or promise[] that such material or workmanship is defect free or will meet a specified level of performance over a specified period of time." *Id.*

Massachusetts law imposes analogous requirements with respect to warranty claims. Massachusetts courts hold that writings that do not promise that the material or workmanship is defect free or will meet a specified level of performance over a specified period of time do not constitute a warranty. For example, in *Hannon*, 385 Mass. at 822, the SJC rejected an express warranty claim based on a pool construction advertising brochure that stated that the pools were

---

[12] In Massachusetts, an express warranty is created by "(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise. (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description." G. L. c. 106, § 2-313.

"designed and constructed to the highest quality specifications." *Id.* Noting that "[n]ot every statement in an advertising brochure . . . constitutes an express warranty," the court concluded that "the language . . . [from the brochure] seems to be, at most, 'an affirmation merely of the value of the goods,'" not an express warranty. *Id.* at 824, *citing* G. L. c. 106, § 2-313(2). *See also Jones v. Walter Kidde Portable Equip.*, 183 F.3d 67, 70 (1st Cir. 1999) (applying Massachusetts law) (owner's manual statement that tourniquet was designed to maintain originally set pressure could not, as "a matter of law," constitute an express warranty given surrounding qualifications and instructions on use). Similarly, in *Linnen v. A.H. Robbins Co.*, 1999 WL 1441933 *1 (Mass. Super. Dec. 20, 1999), the court rejected the assertion that a standard pharmacy patient information form distributed with all prescriptions, stating that "most patients experience little or no problems while taking their medication," was an express warranty. "A claim for breach of express warranty requires proof that the defendant promised a *specific result* that was not achieved," and the statements were not "an express promise that [plaintiff] would not experience any side effects." *Id.*

> **b.    The Owner's Manual does not Promise a "Specified Level of Performance."**

The statement that "DEX-COOL is designed to remain in your vehicle for 5 years or 150,000 miles . . . if you add only DEX-COOL extended life coolant" does not promise a specific level of coolant *performance*. To the contrary, it is in the nature of a maintenance interval, much like the similar provision in virtually every vehicle owner's manual that indicates how often engine oil should be changed. Properly construed, it simply explains how long DEX-COOL, if used and maintained properly, was designed to remain in the vehicle. Importantly, the owner's manual does not state that the coolant will never need to be replaced or that the vehicle owner will not need to add more fluid during the earlier of five years or 150,000 miles.[13] Rather,

---

[13] Although outside the scope of the current motion, it is worth noting that the vehicle condition described in the complaint would, in GM's experience, arise only in the event of an inappropriate mixture of coolant materials or extended running of the engine with very low coolant levels.

the GM owner's manual simply makes a general statement regarding DEX-COOL's design, accompanied by a variety of related required maintenance instructions.[14]

   c.    **The Owner's Manual, Taken as a Whole, Cannot be Construed to Warrant that DEX-COOL is "Maintenance Free."**

Further, by asserting that isolated statements in the owner's manual "warrant" DEX-COOL to be "maintenance free" (Cplt. ¶3), plaintiff ignores other relevant language that modifies such statements. According to G. L. c. 106, § 2-316 "words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other." *See Stuto v. Corning Glass Works*, 1990 U.S. Dist. LEXIS 9320, at *20 (D. Mass. Jul. 23, 1990) ("[e]xpress warranties must be construed in a manner consistent with language purporting to negate or limit warranties"). In *Stuto*, the court held that advertisements claiming that glass plates were "unbreakable" did not create a general warranty of unbreakability because the ads also stated that the manufacturer would replace any plates that broke, chipped or cracked, which effectively "rules out any assertion of indestructibility." *Id.* Here, the manual specifically instructs users to check the coolant level regularly and when necessary to fill the system with a specified mixture of DEX-COOL and clean water. The instruction to check levels regularly (and fill when necessary) is fundamentally inconsistent with an assertion that GM "warranted" DEX-COOL to be "maintenance free." As a matter of law, the language relied upon by plaintiff could not create a general warranty of zero-maintenance for "5 years or 150,000 miles."

---

[14] It is well settled that statements lacking a specific promise or guaranty cannot form the basis of a breach of warranty claim. *See Shreve v. Sears, Roebuck & Co.*, 166 F. Supp. 2d 378, 420 (D. Md. 2001) (descriptive statement in owner's manual explaining operation of snow thrower did not constitute written warranty); *Goodman v. Perlstein*, 1989 U.S. Dist. LEXIS 8420, at *4 (E.D. Pa. July 21, 1989) (appraisal certificate, making representations as to shape, weight, color and value of diamond, did not "bear the ring of a warranty under the Magnuson-Moss Act," because it did not promise "such material or workmanship is defect free or will meet a specified level of performance over a specified period of time"); *Cosman v. Ford Motor Co.*, 674 N.E.2d 61, 69 (Ill. App. Ct. 1996) (affirming dismissal of warranty claim because statements in owner's manual were not "written warranties as defined under section 2301 of the Magnuson-Moss Act" where plaintiffs "fail[ed] to allege with specificity" that manual contained "any written warranties, affirmations, or promises").

**3.    Because Plaintiff does not Allege that He Reviewed or Relied on the Owner's Manual Statement Prior to Purchase, It Cannot be Part of the Basis of his Bargain.**

Even if the owner's manual statement is read as a promise of a specified level of future performance, the warranty claims still fail because neither Natale nor Burns allege they actually saw or read the statement or otherwise relied on it in the decision to purchase a GM vehicle. Even an actual performance level promise only rises to the level of a warranty where it "becomes part of the basis of the bargain between a supplier and a buyer." G. L. c. 106, § 2-313; 15 U.S.C. § 2301(6). If there is no reliance upon the alleged warranty in making the purchase, it cannot be part of the basis of the bargain. *See Stuto*, 1990 U.S. Dist. LEXIS 9320, at *15 ("some minimum of reliance is a required element of a breach of express warranty claim in [Massachusetts]". Applying this rule, *Stuto* held that the plaintiff "could not have relied on the express warranty that [he] now claims defendant's advertisements created [since he] cannot recall having ever seen or heard advertisements … prior to the litigation."[15] *Id.* at *16.

Although the Complaint makes the conclusory assertion that the manual "became part of the basis of the bargain," obviously mindful of Rule 11, like Corkery, neither Natale nor Burns allege the they actually read the manual, much less the portion relating to DEX-COOL, or that they relied on the DEX-COOL statements in purchasing their vehicles. Without allegations of reliance, or at least knowledge prior to recruitment by counsel, the Complaint does not state a claim for breach of warranty.

---

[15] *See also Penta v. Covino*, 1994 WL 14858, at *3 (Mass. App. Ct. Jan. 12, 1994) (failure to establish actual awareness of warranty "precluded the necessary finding that such affirmation became part of the 'basis of the bargain' between the parties so as to constitute an express warranty"); *Cipollone v. Liggett Group, Inc.*, 893 F.2d 541, 567-69 (3d Cir. 1990), *rev'd in part, aff'd in part*, 505 U.S. 504 (1992) (interpreting N.J.'s U.C.C. § 2-313, virtually identical to Massachusetts's) ("plaintiff effectuates the 'basis of the bargain' requirement of section 2-313 by proving that she read, heard, saw or knew of the advertisement containing the affirmation of fact or promise"); *Shreve*, 166 F. Supp. 2d at 420 (owner's manual could not form a basis for an express warranty claim because plaintiff did not receive and rely on manual in making purchase).

**4.    Plaintiff does not Allege that the Owner's Manual Statement Regarding DEX-COOL is Untrue.**

Plaintiff also does not allege that the owner's manual statement is false, an essential element of a warranty claim.  *See, e.g., Hannon*, 385 Mass. at 823-24 (even assuming "that 'designed and constructed to the highest quality specifications' constitutes an express warranty, [plaintiff] has not demonstrated that Aquatech breached that warranty" given his failure to assert, on appeal, that "the design of the pool was flawed").  Similarly, in *In re Anti-Lock Brake Prod. Liab. Litig.*, 966 F. Supp. at 1531, the court dismissed breach of warranty claims that did not allege that statements regarding the performance of anti-lock braking systems were untrue. Here, the Complaint does not allege that the owner's manual statement about DEX-COOL was false.  Without an allegation that the coolant was not designed as stated (*i.e.,* to last the earlier of five years and either 100,000 or 150,000 miles), the warranty claims fail as a matter of law.

**5.    Plaintiff has not Alleged Satisfaction of all Conditions Precedent to the Alleged Warranty.**

The warranty claims also fail as a matter of law because plaintiff does not allege that he has satisfied all conditions precedent.  Specifically, like Corkery, neither Natale nor Burns allege any of the following: (i) they used only DEX-COOL coolant in their vehicles; (ii) they checked the coolant levels regularly; and (iii) when necessary, they added the proper coolant mixture. Allegations that conditions precedent are satisfied are essential in any contract or warranty claim. *See, e.g., Massachusetts Mun. Wholesale Elec. Co. v. Danvers*, 411 Mass. 39, 45 (1991).

The specific language plaintiff points to as a warranty states that DEX-COOL "is designed to remain in your vehicle for 5 years or 150,000 miles . . . *if you add only DEX-COOL extended life coolant*."  (emphasis added).  Although precise language is not required to create a condition precedent, use of the word "if" is certainly indicative of a condition precedent. *See id.*, *citing* Restatement (Second) of Contracts §226, cmt a (1981). Because the owner's manual instructs owners to check coolant levels, and add the proper mixture of DEX-COOL if necessary, even if it could constitute a warranty, these instructions are conditions precedent.  Because

- 17 -

neither Natale or Burns allege that they satisfied such conditions precedent, the warranty claims should be dismissed.

**6.    Plaintiff has Failed to Allege that a Breach of the Claimed Warranty was the Proximate Cause of his Damages.**

The warranty claims should also be dismissed because there are no allegations of any actual vehicle repairs, much less any repairs caused by a breach of the alleged "warranty" statement in the owner's manual. *See Wheeler v. Sunbelt Tool Co., Inc.*, 537 N.E.2d 1332, 1342 (Ill. App. 4th Dist. 1989) ( "[p]laintiff must establish the injury was proximately caused by the breach of warranty"); *Shreve*, 166 F. Supp. 2d at 421 (no breach of warranty where "there is no showing that a breach of the express warranty was a proximate cause of his injury").  In fact, the Complaint does not allege any actual problems or repairs caused by DEX-COOL not having been "designed to remain in [the] vehicle for 5 years or 150,000 miles (240,000 km) whichever occurs first."

Further, while plaintiff alleges that because of DEX-COOL he may have to pay for certain "[r]eplacements, repairs, or inspections," (Cplt. ¶21), plaintiff does *not* specify any actual repairs, let alone any repairs caused by DEX-COOL's design.  Nor does he allege that he ever presented his vehicle to a GM dealer for repair, which is an additional condition precedent to any entitlement under GM's express written warranty.  The absence of these allegations is critical because, among other reasons, the condition described in the complaint -- a "rusty sludge" in the cooling system (which is not alleged to have occurred) -- is a condition that exists primarily, if not exclusively, when the vehicle has been operated for an extended period with the coolant level low and/or when improper coolant has been used (both conditions addressed in the accompanying maintenance instructions).  Because Natale has not alleged any vehicle problems proximately caused by the alleged breach of warranties, the claims should be dismissed.

**7.    Count II (Breach of Implied Warranties) and III (Reformation) Fail as a Matter of Law and Therefore Should be Dismissed.**

Count II asserts a purportedly distinct "breach of implied warranties" claim regarding the merchantability of DEX-COOL.    As noted above, however, the implied warranty of

- 18 -

merchantability "is primarily directed at the operative essentials of a product … It is not intended to guarantee high quality or perfection of detail." *Hannon*, 385 Mass. at 822. *See also In re Anti-Lock Brake Products Liab. Litig.*, 966 F. Supp. at 1533. Because there is no allegation that plaintiff's automobile was unfit for general use or that use of DEX-COOL was unreasonably dangerous, the breach of implied warranty of merchantability claim fails.

Similarly, the plaintiff's "Reformation of Warranty" claim fails. The essence of this claim, and of the statute upon which it is based, is that a plaintiff may ask a court to declare a specific contractual provision unconscionable yet enforce the remainder of the contract as if it had been written without the offending provision. "The issue [of unconscionability] is one of law for the court, and the test is to be made as of the time the contract was made." *Zapatha v. Dairy Mart, Inc.*, 381 Mass. 284, 291 (1980).

Without identifying *any* particular limitation as unconscionable, Natale asserts that the remedy limitations under the GM written warranty are "impermissibly one-sided, substantially unfair and unreasonably favorable" to GM. (Cplt. ¶ 45). Of course, because neither Natale nor Burns allege that they presented their vehicles to GM for repairs, they can not allege that any recovery was prevented by any warranty limitation. Moreover, the failure to identify a single problematic warranty provision is identified is not surprising, because each and every limitation in the warranty (Ex. B, at 9-11) is clearly articulated, prominently featured, and narrowly tailored to protect GM from unforeseeable, meritless or excessive warranty claims.[16] Because none of the limitations are oppressive or create unfair surprise, the reformation claim fails. *Cf. Boston Helicopter Charter, Inc. v. Agusta Aviation Corp.*, B.L., 767 F. Supp. 363, 374-76 (D. Mass. 1991); *Post v. Belmont Country Club*, 2000 WL 33170784, at *4 (Mass. Super. Nov. 11, 2000).

---

[16] Plaintiff fails to identify any offending provision even though Judge Gershengorn noted that "Count III of the Complaint is insufficiently definite for GM to reasonably be expected to respond insofar as it does not identify the particular provisions, or the substance thereof, that is purportedly unconscionable." *Corkery*, Exhibit A, at 11 n.5.

**8.    Plaintiff's Claim for Unjust Enrichment (Count V) Fails As Well.**

Finally, to state a claim for unjust enrichment, plaintiff must allege facts which, if proven, would demonstrate that a "reasonable expectation" of a benefit had been frustrated. *Wit Corp. v. Weber*, 2001 WL 492155, at *2 (Mass. Super. Apr. 25, 2001). As noted, there is no allegation that either Natale's or Burns' GM vehicle have experienced any malfunction, let alone a malfunction that GM did not remedy under the manufacturer's warranty. It is simply not reasonable to expect that a GM car will never experience any type of malfunction. Indeed, automobiles come equipped with a manufacturer's warranty because consumers understand that there will be malfunctions. As such, Judge Gershengorn held that the unjust enrichment claim was pre-mature. *See Corkery*, <u>Exhibit</u> <u>A</u>, at 11-12, *quoting Fay, Spofford & Thorndike, Inc. v. Massachusetts Port Auth.*, 7 Mass. App. Ct. 336, 341 (1979) (dismissing unjust enrichment claim, in part, because the relationship with GM is governed by the written manufacturer's warranty).[17]

## IV.    CONCLUSION

For these reasons, defendant General Motors Corporation's motion to dismiss should be granted in its entirety, and plaintiff's complaint should be dismissed with prejudice.

Date: June 10, 2005

**GENERAL MOTORS CORPORATION,**

By its attorneys,

/s/ Carol E. Head
John R. Skelton, BBO #552606
Carol E. Head, BBO #652170
**BINGHAM MCCUTCHEN LLP**
150 Federal Street
Boston, MA  02110-1726
(617) 951-8000

---

[17] The remedy of unjust enrichment or quantum meruit is only applicable where there is no contract. *See In re Harbour House Operating Corp*., 26 B.R. 324, 330 (Bkrtcy. Mass 1982), *citing Kass v. Todd*, 362 Mass. 169, 175(1972); *Fay, Spofford & Thorndike, Inc. v. Massachusetts Port Authority*, 7 Mass. App. Ct. 336, 341 (1979).

*Of counsel:*
Lawrence S. Buonomo, Esq.
General Motors Legal Staff
400 Renaissance Center
Mail Code 482-026-601
Detroit, Michigan  49265-4000
(313) 665-7390

Robert B. Ellis (IL ARDC #6206846)
Scott F. Hessell (IL ARDC #6275119)
**KIRKLAND & ELLIS LLP**
2300 E. Randolph Drive
Chicago, IL  60601
(312) 861-2000

## <u>CERTIFICATE OF SERVICE</u>

    I, Carol E. Head, hereby certify that a true and correct copy of the foregoing Defendant General Motors Corporation's Memorandum in Support of its Motion to Dismiss was served on June 10, 2005, via mail, to the following:

        David Pastor, Esq.
        Kenneth G. Gilman, Esq.
        Gilman and Pastor, LLP
        60 State Street, 37th Floor
        Boston, MA  02109

        /s/ Carol E. Head
              Carol E. Head

## COMMONWEALTH OF MASSACHUSETTS

**MIDDLESEX, ss.**                                    **SUPERIOR COURT**
                                                      **CIVIL ACTION**
                                                      **NO. 03-3881**

### ERIN CORKERY[1]


### vs.


### GENERAL MOTORS CORPORATION


### MEMORANDUM OF DECISION AND ORDER ON
### DEFENDANT'S MOTION TO DISMISS


### INTRODUCTION

This putative class action suit was brought by Erin Corkery (the "plaintiff") on behalf of

Massachusetts residents owning General Motors ("GM") vehicles equipped with DEX-COOL

coolant.  The complaint seeks monetary damages for the decreased economic value of their

vehicles caused by the alleged failure of the DEX-COOL coolant to perform as warranted by

GM, and equitable relief in the form of an injunction to reform certain unfair provisions of the

warranty.  Specifically, the complaint seeks damages for breaches of an express warranty (Count

I) and the implied warranty of merchantability (Count II), violation of the Magnuson-Moss

Warranty Act, 15 U.S.C. § 2301(6)(A) (Count IV), unjust enrichment (Count V), and violation of

G.L. c. 93A, § 9 (Count VI), as well as an injunction to reform certain provisions of the written

---

[1] on behalf of herself and all others similarly situated

warranties (Count III). The defendant now moves pursuant to Mass. R. Civ. P. 12(b)(6) to

dismiss the complaint for failure to state a claim upon which relief can be granted. For the

reasons to follow, the defendant's motion is **ALLOWED**.


## BACKGROUND

For purposes of this motion, the Court accepts as true the factual allegations in the

complaint and makes all reasonable inferences from those facts in the plaintiff's favor. *Fairneny*

*v. Savrogan Co.*, 422 Mass. 469, 470 (1996). Because the class has not been certified, the

allegations in the complaint will be considered only insofar as they relate to the named plaintiff,

Erin Corkery. The Complaint, read accordingly, sets forth the following allegations:

GM equipped various vehicles manufactured between 1996 and 2003 with a coolant

named DEX-COOL. The plaintiff purchased, and still owns, a 2001 Chevrolet Malibu which

was equipped with DEX-COOL. The owner's manual (the "Manual"), which was given to the

plaintiff at the time of sale, and a label affixed to the vehicle included statements about DEX-

COOL. Specifically the Manual states:

> The cooling system in your engine is filled with DEX-COOL engine coolant. This
> coolant is designed to remain in your vehicle for 5 years or 150,000 miles
> (240,000km), whichever comes first, if you add only DEX-COOL extended life
> coolant ... A 50/50 mixture of clean, drinkable water and DEX-COOL coolant will:
> - Give freezing protection down to -34F
> - Give boiling protection up to 265F
> - Protect against rust and corrosion
> - Help keep the proper engine temperature
> - Let the warning lights and gaps work as they should

The Manual also states that "[i]f coolant other than DEX-COOL is added to the system,

premature engine, heater core or radiator corrosion may result. In addition, the engine coolant

2

will require change sooner – at 30,000 miles or 24 months, whichever occurs first." It also cautions that: "Damage caused by the use of coolant other than DEX-COOL is not covered by your new vehicle warranty." The manual states that owners should check the DEX-COOL coolant level at every fuel fill.

The plaintiff alleges that if left in the vehicle for five years or 150,000 miles DEX-COOL may cause rusty sludge to form in the cooling system, corroding and/or clogging the cooling system, damaging other parts of the engine and requiring either or both flushing of the cooling system and replacement of damaged parts. As a result, she alleges that the vehicle's value is diminished. The plaintiff does not, however, allege that the DEX-COOL in her vehicle has not performed as the manual states or that it has caused any of the aforementioned damage.

The plaintiff further alleges that when she bought the vehicle, GM knew or should have known of the defective DEX-COOL and that the representations in the Manual were false and/or misleading. Thus, the plaintiff alleges that she was deceived as to the true nature of DEX-COOL and, further, the actual value of her vehicle.[2] In 1999, GM issued a technical bulletin to its service personnel admitting that vehicles equipped with DEX-COOL were susceptible to the above-noted problems. However, GM intentionally withheld the defective nature of DEX-COOL and misrepresented that the actual cause of these problems was improper owner maintenance–specifically, the owners' failure to maintain the DEX-COOL fluid level properly over extended periods of time. GM refused to make full disclosure to the public of the full extent of the potential damages of having DEX-COOL in the cooling system.

On September 18, 2003, the plaintiff served a 93A demand letter upon the defendant.

---

[2] There are no claims for fraud, misrepresentation, or breach of contract.

3

The defendant did not make an offer of relief in response.

## DISCUSSION

*1. Standard*

Under Mass. R. Civ. P. 12(b)(6), a motion to dismiss will be allowed only if the plaintiff

has failed to state a claim upon which relief can be granted. Mass. R. Civ. P. 12(b)(6). A "

'complaint should not be dismissed . . . unless it appears beyond doubt that the plaintiff can

prove no set of facts in support of [her] claim which would entitle [her] to relief.'" *Nader v.*

*Citron*, 372 Mass. 96, 98 (1977), quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). "[A]

complaint is not subject to dismissal if it would support relief on any theory of law," *Whitinsville*

*Plaza, Inc. v. Kotseas*, 378 Mass. 85, 89 (1979), "even though the particular relief [which the

plaintiff] has demanded and the theory on which he seems to rely may not be appropriate."

*Nader*, 372 Mass. at 104 (citations omitted). When evaluating the sufficiency of a complaint

pursuant to Mass. R. Civ. P. 12(b)(6), the court will accept as true the well pleaded factual

allegations of the complaint as well as any inference which can be drawn therefrom in the

plaintiff's favor. *Fairneny*, 422 Mass at 470.

*2. Express Warranty Claim & Magnuson-Moss Warranty Act- Counts I & IV*

GM argues that these claims must be dismissed because the complaint fails to allege any

legally cognizable injury–*i.e.*, the complaint seeks compensation for damages the plaintiff *might*

*possibly* suffer in the future. The plaintiff, on the other hand, argues that the legally cognizable

injury is the vehicle's *present* diminution in value resulting from the defective coolant. Thus, the

4

question before the court is whether the plaintiff states a legally cognizable breach of express warranty claim by alleging that the vehicle came equipped with functional coolant that has not malfunctioned, has not caused physical damage or personal injury, does not pose a risk of bodily or personal injury, but decreases the value of the vehicle because it may cause damage to the vehicle in the future. For the reasons to follow, this court answers that question in the negative.

The express warranty claims must be dismissed, because the plaintiff does not allege that the DEX-COOL in *her vehicle* is defective or has malfunctioned. A manufacturer's liability under an express warranty is predicated on an actual product defect that manifests itself–as opposed to a defect which might theoretically or potentially arise. Courts have phrased this issue differently, some considering it a failure to plead injury or damages, see, e.g., *Briehl v. General Motors Corp.*, 172 F.3d 623, 627-28 (8th Cir. 1999) ("courts have been particularly vigilant in requiring allegations of injury or damages") (and cases cited), and others considering it a failure to allege that the product is actually defective, see, e.g., *Khan v. Shiley Inc.*, 217 Cal.App.3d 848, 855 (1990) ("where a plaintiff alleges a product is defective, proof that the product has malfunctioned is essential to establish liability for an injury caused by the defect"). In any event, most courts require that a plaintiff allege that his or her product is defective or has malfunctioned in order to recover for breach of warranty. *Briehl*, 172 F.3d at 627-28 (and cases cited); *Jarman v. Untied Indus. Corp.*, 98 F.Supp. 2d 757, 767-68 (S.D. Miss. 2000) ("unless there is actually a failure in product performance, there is no basis at all for claiming that the plaintiff has been damaged in any way. Mere suspicion of a lost bargain . . . will not support an award of damages"); *Yost v. General Motors Corp.*, 651 F. Supp. 656, 657-58 (D.N.J. 1986) ("The basic problem in this case is that plaintiff Yost has not alleged that he has suffered any damages. He

5

has not stated that the engine in his vehicle is defective in any way. All he is able to allege is that

the potential leak is 'likely' to cause damage and 'may' create potential safety hazards"); *Verb v.*

*Motorola, Inc.*, 672 N.E.2d 1287, 1297 (Ill. App.3d 1996) ("plaintiffs' . . . claims constitute

conjecture and speculation. Plaintiffs failed to plead specific facts that . . . the telephones are

defective; rather, their warranty claims, like their other claims, are based upon the possibility that

the telephones *may* be defective because of the 'unproven' safety of those telephones"); *Khan*,

217 Cal.App.3d at 857 ("A cause of action does not presently exist under [warranty] theory

premised on the *risk* the [product] *may* malfunction in the future").

    This Court agrees with the rule adopted in those cases and will apply it in this case. Put

simply, a manufacturer does not breach a warranty if the product performs as warranted and does

not exhibit the alleged defect.   If, and when, the plaintiff's vehicle is actually damaged by DEX-

COOL, the alleged warranty can then, be invoked to remedy the alleged defect and resulting

damages. There are good reasons for courts to adhere to the well established rule unless there is

good and sufficient to deviate from it.

    Allowing compensation before the alleged defect manifests itself would present

substantial difficulties of proof as to damages.  Specifically, in order to arrive at a figure which

represents the actual 'diminished value' of the vehicle, a jury would need to determine the risk of

the defect actually occurring as well as the cost of remedying the defect at that time.  Where the

plaintiff alleges a myriad of possible damage to her vehicle requiring varying remedies–ranging

from radiator replacement to a mere coolant flush–such a calculation is inherently speculative

and conjectural.  On the other hand, precluding warranty claims until the alleged defect manifests

itself creates the potential for arriving at a damages award properly tailored to the actual damage

occasioned by the product malfunction.

In addition, requiring GM to pay damages before the alleged defect manifests itself would lead to simultaneous over and under compensation. The measure of damages would presumably be calculated according to the differential in value between the price as warranted and the price as defective (as measured in terms of risk). See G.L. c. 106, § 2-714(2); *In re Bridgestone/Firestone*, 288 F.3d at n.1. If the plaintiff's vehicle does not ultimately suffer any deterioration caused by DEX-COOL, however, she would be unjustly compensated. On the other hand, if her vehicle at some point in the future requires extensive repairs she would likely be under compensated.[3] In short, because the plaintiff's claim is premature, it would be difficult for a jury to arrive at an amount of damages that fairly compensates the plaintiff for the defendant's alleged breach of warranty without resorting to conjecture or surmise.

In addition, such a rule would invite a flood of class action product liability litigation. Nearly every product which could be shown to contain *some* defect or to underperform as warranted could become the subject of a massive class action suit. As GM argues in its brief:

> if a consumer whose product had experienced no malfunction was nevertheless able to state a claim against a manufacturer because some *other* similar product had, at some *other* time under *other* circumstances, allegedly experienced a failure, virtually any consumer could file a lawsuit against any manufacturer of any consumer product the moment that product was purchased. By consistently requiring an allegation that the particular product at issue has malfunctioned, courts ... have effected a reasonable balance between protecting consumers who have actually suffered some legally cognizable injury and insuring that commerce does not grind to a halt to accommodate a spate of groundless lawsuits.

Defendant's Reply to Plaintiff's Opp. to Defendan't Mot. to Dismiss, p.4.

---

[3] This assumes that the plaintiff could not later sue again if the defect actually manifested itself at a later date.

7

Finally, there are substantial issues concerning the ripeness of the issue. Because no defect has manifested itself in the plaintiff's vehicle, GM has not been given the opportunity to honor its obligations under the warranty. It may be that if the defect manifests itself in the plaintiff's vehicle, GM will cure the defect under the warranty without the plaintiff needing to resort to the courts for relief. In short, GM cannot "breach" a warranty until it has first been given the opportunity to honor it.

It bears noting that this case must be distinguished from a situation where an allegedly defective product poses a substantial risk of injury or death or is otherwise unmerchantable. See *Holtzman v. General Motors Corp.*, Civil No. 02-1368 (Middlesex Superior Ct., July 2, 2002) (Billings, J.) (and cases cited). In *Holtzman*, the plaintiffs alleged that tire jacks supplied with their vehicles were prone to failing, violated industry standards, and placed users in "great danger of being injured or killed" during their use. As such, the tire jacks were not fit for their ordinary use. While none of the plaintiffs alleged that they had used the tire jack, the Court refused to dismiss their claims. The Court reasoned that because the jacks were unusable, the harm had materialized *at the time of the complaint*: the necessary costs of replacing the jack.

This case is distinguishable for two reasons. First, as noted above, the plaintiff does not allege that DEX-COOL is unreasonably dangerous or otherwise unfit for use as a coolant. In *Holtzman,* as well as all of the cases cited by Judge Billings, the products at issue were either functionally unusable or unreasonably dangerous for their intended use. As such, *at the time of the complaint*, the plaintiffs in those cases had suffered a legally compensable injury under the Uniform Commercial Code and were entitled to the cost of replacement of the unmerchantable product. In this case, however, the plaintiff's claim has not ripened to the point where she has

8

suffered a legally cognizable injury entitling her to compensation.

Second, the nature of the risk in using the product is clearly distinguishable. Where a product poses a risk of bodily injury or even death in violation of an express or implied warranty, additional policy considerations support shifting the risk of those injuries to manufacturers. See *East River Steamship Corp. v. Transamerica Delaval Inc.,* 476 U.S. 858, 866 (1986) ("public policy demands that responsibility be fixed wherever it will most effectively reduce the hazards to life and health inherent in defective products that reach the market"). The alleged defect with DEX-COOL does not implicate those additional policy considerations. The potential damage caused by DEX-COOL–rust, corrosion, and diminished resale value–can be sufficiently compensated by money damages *if and when* those symptoms manifest themselves.[4]

Accordingly, GM's Motion to Dismiss Counts I & IV of the complaint will be **ALLOWED**.

### 3. *Implied Warranty of Merchantability - Count II*

In Massachusetts, a warranty that goods are merchantable is implied in every sale of goods. G.L. c. 106, § 2-314. To state a claim for a breach of an implied warranty of merchantability, a plaintiff must allege that the product, as sold, is not "fit for the ordinary purposes for which such [products] are used." *Id.*; *Hannon v. Original Gunite Aquatech Pools, Inc.*, 385 Mass 813, 822 (1982). "The implied warranty of merchantability, [however,] like that of fitness, is primarily directed at the operative essentials of a product. . . . It is not intended to

---

[4] Because this Court rules that the Plaintiff's claim is premature, it need not decide whether, as a matter of law, the statements in the owner's manual constitute an express warranty. This Court does not decide that issue and nothing in this opinion should be construed as expressing an opinion either way.

9

guarantee high quality or perfection of detail. *Tracy* v. *Vinton Motors, Inc.,* 130 Vt. 512, 516

(1972). There is no implied warranty that the goods shall be of the best or even a very high

quality." *Hannon*, 385 Mass. at 822, citing H. Alperin & R. Chase, Consumer Rights and

Remedies §§ 68, at 158 (1979).

In *Skelton v. General Motors Corp.,* 500 F. Supp. 1181, 1191-92 (N.D.Ill. 1980), *reversed*

*on other grounds,* 660 F.2d 311 (7th Cir. 1981), the plaintiffs alleged that General Motors

breached the warranty of merchantability by installing an inferior model transmission to the one

that was advertised in the vehicle's literature.  The plaintiffs alleged that the inferior transmission

was " 'more expensive to maintain' and 'less desirable to the purchasing public than [the

advertised] Transmissions.'" *Id.* at 1192, quoting the  Second Amended Complaint.  In

dismissing the plaintiffs' implied warranty claims, the court stated:

> The implied warranty of merchantability does not impose a general requirement that
> goods precisely fulfill the expectations of the buyer. Instead, it provides for a
> minimum level of quality —— that the goods 'are fit for the ordinary purposes for
> which such goods are used.' U.C.C. §§ 2-314(2)(c). Automobiles are designed for
> driving, and therefore the question in this case is whether the GM vehicles at issue
> were fit for that purpose.

*Id.*

The same reasoning applies here.  The plaintiff's complaint does not allege that DEX-

COOL is unfit for use as a coolant, that the coolant falls below a minimally acceptable standard

of quality, that the vehicle is unfit for driving, or that the car is unreasonably dangerous with the

defective coolant.  The gravamen of the complaint is that DEX-COOL fails to achieve the

enhanced levels of performance described in the Manual–much like the argument of the plaintiffs

in *Skelton* that the transmission did not perform as well as described in the literature.  As such,

10

the plaintiff in this case fails to state a claim for a breach of the implied warranty of merchantability. *Id.*; *Hannon*, 385 Mass. at 822. GM's motion to dismiss Count II of the first amended complaint will be **ALLOWED**.

### 4. Reformation - Count III

Pursuant to G.L. c. 106, § 2-302, Count III seeks reformation of the alleged written warranty insofar as certain provisions unfairly limit GM's liability thereunder.[5] Because the plaintiff's claims under the alleged written warranty are premature, it is unnecessary to decide whether these provisions are an unconscionable limitation of liability (if they are a limitation at all). Therefore, the Motion to Dismiss Count III will be **ALLOWED**.

### 5. Unjust Enrichment - Count V

The essence of the plaintiff's unjust enrichment claim is that she overpaid for her vehicle and it would be unjust for GM to retain the benefits of that sale. A claim that a party has been unjustly enriched seeks the equitable remedy of restitution. *Keller v. O'Brien*, 425 Mass. 774, 778 & n. 8 (1997). Restitution is appropriate when the circumstances of receipt or retention of a benefit "are such that, as between the two persons, it is unjust for [one] to retain it." *Id.*, 425 Mass. at 778, quoting *Nat'l Shawmut Bank v. Fidelity Mut. Life Ins. Co.*, 318 Mass. 142, 146 (1945). The paradigmatic claim for unjust enrichment arises in the absence of an express contract when a party confers valuable services upon another and the receiving party accepts those benefits under circumstances where the law imposes a duty to pay for the value of the work See, e.g., *Salamon v. Terra*, 394 Mass. 857, 859 (1985). This is not such a case.

---

[5] The complaint does not identify the allegedly unfair limitations or the substance of the unfair provisions. At the hearing and on the papers, it is apparent that the plaintiff is referring to the statement in the owner's manual that the coolant level should be checked at every fuel fill. While this Court will dismiss that Count on other grounds, it should be noted that the Count III of the complaint is insufficiently definite for GM to reasonably be expected to respond insofar as it does not identify the particular provision, or the substance thereof, that is purportedly unconscionable. See Mass. R. Civ. P. 12(e).

Moreover, a claim in equity alleging unjust enrichment is not available to a plaintiff when the relationship between the parties is governed by a contract or a purported warranty. See *Fay, Spofford & Thorndike, Inc. v. Mass. Port Auth.*, 7 Mass. App. Ct. 336, 341 (1979) (where the parties' relationship is governed by a contract, claims between them are "for damages on the contract, not on a fair value basis without regard to the contract"); *Cargill v. Gilmore*, Civil Action No. 0485G (Suffolk Superior Ct., August 18, 1993) (Garsh, J.) (no equitable claim for unjust enrichment lies where there are remedies at law); *Commonwealth v. Pace*, 616 F.Supp. 815, 822 (D.Mass. 1985) (same).  Because the relationship between the parties is governed by the contract for the sale of the vehicle and any related warranties, the plaintiff may not maintain an off-the-contract action in equity for unjust enrichment.

Additionally, plaintiff's claim that it would be unjust for GM to retain the alleged overpayment is premature where, as discussed above, GM has not had the opportunity to honor the purported warranty.  It is premature to say that GM has been unjustly enriched from the sale of the vehicle, because the alleged defect may never manifest itself or, if it does, GM might make any necessary repairs at that time.  Accordingly the motion to dismiss Count V will be **ALLOWED**.


### 6. *G.L c. 93A - Count VI*

For substantially the same reasons as Counts I & IV, Count VI must also be dismissed. Put simply, the plaintiff's claim is premature.  Specifically, the plaintiff's claim is premised on GM's alleged failure to honor its written warranty and related conduct.  However, as noted above, the plaintiff does not allege that the DEX-COOL in the plaintiff's vehicle is defective or caused damage to the vehicle, or that GM has unfairly or deceptively evaded it obligations under the purported warranties.  Accordingly, the Motion to Dismiss Count VI will also be **ALLOWED**.

12

**ORDER**

For the reasons stated above, it is hereby **ORDERED** that the defendant's Motion to Dismiss the complaint be **ALLOWED** and the complaint be **DISMISSED**.


Wendie I. Gershengorn

DATED: August 2, 2004                    Justice of the Superior Court

13



LIGHT DUTY TRUCK

WARRANTY AND OWNER
ASSISTANCE INFORMATION

GMCC000091423

## IMPORTANT

This booklet contains important information about the vehicle's warranty coverage. It also explains **Owner Assistance Information and GM's Participation in an Alternative Dispute Resolution Program.**

Keep this booklet with your vehicle and make it available to a Chevrolet dealer if warranty work is needed. Be sure to keep it with your vehicle when you sell it so future owners will have the information.

Owner's Name _____

Street Address _____

City & State _____

Vehicle Identification Number (VIN): _____

Date Vehicle First Delivered or Put In Use:

Month _____ Day _____ Year _____

Odometer Reading on Date Vehicle First Delivered or Put in Use:

X _____

1

GMCC000091424



Have you purchased the Genuine GM Protection
Plan? The GM Protection Plan may be purchased
within specific time/mileage limitations. See the
information request form on page 31 of this
booklet. Remember, if the service contract you
are considering to purchase does not have the GM
Protection Plan emblem shown above on it, then
it is not the Genuine GM Protection Plan from
General Motors.

©1998 Chevrolet Motor Division, General Motors Corporation. All rights reserved. GENERAL MOTORS, GM,
CHEVROLET, and the CHEVROLET emblem are registered trademarks of General Motors Corporation.
Part No. C9917 B

2

GMCC000091425

# 1999 Chevrolet Truck Warranty and Owner Assistance Information

An Important Message to Chevrolet Truck Owners ........................................... 4
Warranty Coverage at a Glance ............................................................. 5
New Vehicle Limited Warranty
    What Is Covered ....................................................................... 7
    What Is Not Covered ................................................................... 9
Things You Should Know About the New Vehicle Limited Warranty ......................... 12
Emission Control Systems Warranties
    1. Federal Emission Control Systems ................................................... 18
    2. California Emission Control Warranty ................................................ 19
    3. Emission Warranty Parts List ....................................................... 21
    4. Things You Should Know About The Emission Control Systems Warranties ............... 25
Owner Assistance
    Customer Satisfaction Procedure ....................................................... 27
    GM Participation in an Alternative Dispute Resolution Program ......................... 27
    Assistance for Text Telephone (TTY) Users ............................................ 28
    Roadside Assistance ................................................................... 28
    Courtesy Transportation ............................................................... 28
    State Warranty Enforcement Laws ....................................................... 28
    Special Policy Adjustment Programs .................................................... 29
    Customer Assistance Offices ........................................................... 30
    GM Offices Overseas ................................................................... 30
GM Protection Plan ........................................................................ 31

3

GMCC000091426

## An Important Message To Chevrolet Truck Owners . . .

### Chevrolet's Commitment to You

We are committed to assure your satisfaction with your new Chevrolet.

Your Chevrolet dealer also wants you to be completely satisfied and invites you to return for all your service needs both during and after the warranty period.

### Vehicle Operation and Care

Considering the investment you have made in your Chevrolet, we know you will want to operate and maintain it properly. We urge you to follow the maintenance instructions contained in your Owner's Manual or maintenance publication.

If you have questions on how to keep your Chevrolet in good working condition, see your Chevrolet dealer, the place many Chevrolet customers choose to have their maintenance work done. You can rely on your Chevrolet dealer to use the proper parts and repair practices.

### Maintenance Records

Retain receipts covering performance of regular maintenance. Receipts can be very important if a question arises as to whether a malfunction is caused by lack of maintenance or a defect in material or workmanship.

Receipts should be retained in the glove box literature portfolio. Also, a "Maintenance Record" form is provided in the Maintenance Schedule section of the Owner's Manual for your convenience in recording services performed.

### Owner Assistance

Your Chevrolet dealer is best equipped to provide all your service needs. In the event you have any questions or concerns, talk to a member of dealer management. If you still need assistance, follow the additional procedure outlined in "Owner Assistance" on page 27 of this booklet.

### GM Participation in an Alternative Dispute Resolution Program

On page 27 of this booklet, you will also find information on the voluntary, non-binding Alternative Dispute Resolution Program in which GM participates.

We thank you for choosing a Chevrolet.

*Chevrolet Motor Division*

4

GMCC000091427

## Warranty Coverage at a Glance

The 1999 warranty coverages are summarized below. Please read pages 7 through 26 for complete details.

| New Vehicle Limited Warranty | | | |
|---|---|---|---|
| Coverage | 3 YRS/ 36,000 MI | 5 YRS/ 100,000 MI | 6 YRS/ 100,000 MI |
| Bumper-to-Bumper (includes tires) | ■ | | |
| 6.5L Diesel Engine | ■ | ▨ | |
| Sheet Metal | | | |
| • Corrosion | ■ | | |
| • Rust-Through | ■ | ■ | |

■ No Charge

▨ $100 Deductible Charge.

5

GMCC000091428



## Emission Control Systems Warranties

| Coverage | 2 YRS/ 24,000 MI | 3 YRS/ 36,000 MI | 3 YRS/ 50,000 MI | 5 YRS/ 50,000 MI | 5 YRS/ 100,000 MI | 7 YRS/ 70,000 MI | 8 YRS/ 80,000 MI | Vehicle Life |
|---|---|---|---|---|---|---|---|---|
| **Federal** | | | | | | | | |
| ● Gasoline Engines | | | | | | | | |
| – light duty emission control system | | | | | | | | |
| – catalytic converters & powertrain control module | | | | | | | | |
| – heavy duty emission control system | | | | | | | | |
| ● 6.5L Diesel Engine | | | | | | | | |
| **California** | | | | | | | | |
| ● Gasoline Engines | | | | | | | | |
| – light duty and medium duty emission control systems | | | | | | | | |
| – specified components (light and medium duty emission control systems) | | | | | | | | |
| – heavy duty emission control system | | | | | | | | |
| ● Diesel Engines* | | | | | | | | |
| **Noise Emissions** | | | | | | | | |
| ● Applicable to vehicles over 10,000 lbs. GVWR only | | | | | | | | |

▮▮▮▮ Defects in material or workmanship continue to be covered under the New Vehicle Limited Warranty Bumper-to-Bumper coverage.
*or 3,000 hours of operation, whichever comes first.

▨▨ Defects in material or workmanship of emission warranted parts continue to be covered under the 6.5L Diesel engine coverage subject to a $100 deductible charge.

6

GMCC000091429

# 1999 General Motors Corporation New Vehicle Limited Warranty

General Motors Corporation will provide for repairs to the vehicle during the warranty period in accordance with the following terms, conditions and limitations.

## What Is Covered



**Warranty Applies**

This warranty is for GM vehicles registered in the United States and normally operated in the United States or Canada, and is provided to the original and any subsequent owners of the vehicle during the Warranty Period.



**Repairs Covered**

The warranty covers repairs to correct any vehicle defect related to materials or workmanship occurring during the Warranty Period. Needed repairs will be performed using new or remanufactured parts.



**Warranty Period**

The Warranty Period for all coverages begins on the date the vehicle is first delivered or put in use and ends at the expiration of the coverage period.



**Bumper-to-Bumper Coverage**

The complete vehicle is covered for 3 years or 36,000 miles, whichever comes first, except for other coverages listed here under "What Is Covered" and those items listed under "What Is Not Covered" on pages 9, 10 and 11.



**Tire Coverage**

The tires supplied with your vehicle are covered against defects in material or workmanship under the Bumper-to-Bumper coverage. Any tire replaced will continue to be warranted for the remaining portion of the Bumper-to-Bumper coverage period.

Following expiration of the Bumper-to-Bumper coverage, tires may continue to be covered under the tire manufacturer's warranty. Review the tire manufacturer's warranty booklet or consult the tire manufacturer distributor for specific details.

7

GMCC000091430



### Sheet Metal Coverage

Sheet metal panels are covered against corrosion and rust-through as follows:

**Corrosion:** Body sheet metal panels are covered against rust for 3 years or 36,000 miles, whichever comes first.

**Rust-Through:** Any body sheet metal panel that rusts through (an actual hole in the sheet metal) continues to be covered for up to 6 years or 100,000 miles, whichever comes first.

NOTE: Cosmetic or surface corrosion (resulting from stone chips or scratches in the paint, for example) is not included in sheet metal coverage.



### Towing

Towing is covered to the nearest Chevrolet dealer facility if your vehicle cannot be driven because of a warranted defect.



### 6.5L Diesel Engine Coverage

The diesel engines (except those items listed under "What Is Not Covered" on pages 9, 10 and 11) are covered for 5 years or 100,000 miles, whichever comes first. A $100 deductible per repair visit may apply after the vehicle has been in use for 3 years or 36,000 miles, whichever comes first. For additional information, refer to "Things You Should Know About the New Vehicle Limited Warranty" on page 12. Also refer to the appropriate emission control system warranty for possible additional coverages.



### No Charge

Warranty repairs, including towing, parts and labor, will be made at No Charge, less any applicable deductible.



### Obtaining Repairs

To obtain warranty repairs, take the vehicle to a Chevrolet dealer facility within the Warranty Period and request the needed repairs. A reasonable time must be allowed for the dealer to perform necessary repairs.

GMCC000091431

## What Is Not Covered



### Tire Damage or Wear

Normal tire wear or wear-out is not covered. Road hazard damage such as punctures, cuts, snags, and breaks resulting from pothole impact, curb impact, or from other objects is not covered. Also, damage from improper inflation, spinning (as when stuck in mud or snow), tire chains, racing, improper mounting or dismounting, misuse, negligence, alteration, vandalism, or misapplication is not covered.



### Damage Due to Bedliners

Owners of trucks with a bedliner, whether after-market or factory installed, should expect that with normal operation the bedliner will move. This movement may cause finish damage and/or squeaks and rattles. Therefore, any damage caused by the bedliner is not covered under the terms of the warranty.



### Damage Due to Accident, Misuse, or Alteration

Damage caused as the result of any of the following is not covered:

- collision, fire, theft, freezing, vandalism, riot, explosion, or objects striking the vehicle;
- misuse of the vehicle such as driving over curbs, overloading, racing, or other competition. Proper vehicle use is discussed in the Owner's Manual;
- alteration or modification to the vehicle including the body, chassis or components after final assembly by GM. In addition, coverages do not apply if the odometer has been disconnected, its reading has been altered, or mileage cannot be determined.

**NOTE: This warranty is void on vehicles currently or previously titled as salvaged, scrapped, junked, or totaled.**

9

GMCC000091432



**Damage or Corrosion Due to Environment, Chemical Treatments or Aftermarket Products**

Damage caused by airborne fallout (chemicals, tree sap, etc.), stones, hail, earthquake, water or flood, windstorm, lightning, the application of chemicals or sealants subsequent to manufacture, etc., is not covered. See page 13 for details regarding Chemical Paint Spotting.



**Damage Due to Insufficient or Improper Maintenance**

Damage caused by failure to follow the recommended Maintenance Schedule intervals and/or failure to use or maintain fluids, fuel, lubricants, or refrigerants recommended in the Owner's Manual is not covered.



**Maintenance**

All vehicles require periodic maintenance. Maintenance services, such as those detailed in the Owner's Manual or Maintenance publications are the owner's expense. Vehicle lubrication, cleaning, or polishing, as well as items requiring replacement or repair as a result of vehicle use, wear, or exposure are not covered.

Items such as:

- Filters
- Brake Pads / Linings
- Clutch Linings
- Keyless Entry Batteries *
- Audio System Cleaning
- Coolants and Fluids
- Wiper Inserts
- Limited Slip Rear Axle Service
- Tire Rotation
- Wheel Alignment / Balance **

are covered only when replacement or repair is the result of a defect in material or workmanship.

Failure or damage of components due to vehicle use, wear, exposure, or lack of maintenance is not covered.

\* Consumable battery covered up to 12 months only.
\*\* Maintenance items after 7,500 miles.

10

GMCC000091433

**Extra Expenses**
Economic loss or extra expense is not covered.

Examples include:
- Loss of vehicle use
- Inconvenience
- Storage
- Payment for loss of time or pay
- Vehicle rental expense
- Lodging, meals, or other travel costs
- State or local taxes required on warranty repairs

**Other Terms:** This warranty gives you specific legal rights and you may also have other rights which vary from state to state.

General Motors does not authorize any person to create for it any other obligation or liability in connection with these vehicles. Any implied warranty of merchantability or fitness for a particular purpose applicable to this vehicle is limited in duration to the duration of this written warranty. Performance of repairs and needed adjustments is the exclusive remedy under this written warranty or any implied warranty. General Motors shall not be liable for incidental or consequential damages (such as, but not limited to, lost wages or vehicle rental expenses) resulting from breach of this written warranty or any implied warranty.*

* Some states do not allow limitations on how long an implied warranty will last or the exclusion or limitation of incidental or consequential damages, so the above limitations or exclusions may not apply to you.

11

GMCC000091434

## Things You Should Know About the New Vehicle Limited Warranty

### Warranty Repairs — Component Exchanges

In the interest of customer satisfaction, General Motors may offer exchange service on some vehicle components. This service is intended to reduce the amount of time your vehicle is not available for use due to repairs. Components used in exchange are Service Replacement Parts which may be new, remanufactured, reconditioned, or repaired, depending on the component involved.

All exchange components used meet GM standards and are warranted the same as new components. Examples of thetypes of components that might be serviced in this fashion include: engine and transmission assemblies, instrument cluster assemblies, radios, compact disc players, tape players, batteries, and powertrain control modules.

### Warranty Repairs — Recycled Materials

Environmental Protection Agency (EPA) guidelines and GM support the capture, purification, and reuse of automotive air conditioning refrigerant gases and engine coolant. As a result, any repairs GM may make to your vehicle may involve the installation of purified reclaimed refrigerant and coolant.

### Tire Service

Any authorized Chevrolet or tire dealer for your brand of tires can assist you with tire service. If, after contacting one of these dealers, you need further assistance or you have questions, please contact Chevrolet's Customer Assistance Center. The toll-free telephone numbers are listed on page 30.

### 6.5L Diesel Engine Components

The complete engine assembly, including turbocharger components, is covered for defects in material or workmanship for 3 years or 36,000 miles, whichever comes first. No deductible applies during this coverage period. The engine parts listed below continue to be covered (subject to a $100 deductible) for 5 years or 100,000 miles, whichever comes first.

- Cylinder block and heads and all internal parts, intake and exhaust manifolds, timing gears, timing gear chain or belt and cover, flywheel, harmonic balancer, valve covers, oil pan, oil pump, water pump, fuel pump, engine mounts, seals and gaskets.

12

GMCC000091435

- Diesel Fuel Metering System: injection pump, nozzles, high pressure lines and high pressure sealing devices.
- Glow Plug Control System: control/glow plug assembly, glow plugs, cold advance relay, and ECM.

NOTE: Some of the above components may also be covered by the Emission Warranty with no deductible (see pages 21 through 24 for details).

## After-Manufacture "Rustproofing"

Your vehicle was designed and built to resist corrosion. Application of additional rust-inhibiting materials is neither necessary nor required under the Sheet Metal Coverage. GM makes no recommendation concerning the usefulness or value of such products.

Application of after-manufacture rustproofing products may create an environment which reduces the corrosion resistance built into your vehicle. Repairs to correct damage caused by such applications are not covered under your GM New Vehicle Limited Warranty.

## Paint, Trim and Appearance Items

Defects in paint, trim, upholstery or other appearance items are normally corrected during new vehicle preparation. If you find any paint or appearance concerns, advise your dealer as soon as possible. Your Owner's Manual has instructions regarding the care of paint, trim, upholstery, glass, and other appearance items.

## Chemical Paint Spotting

Some weather and atmospheric conditions can create a chemical fallout. Airborne pollutants can fall upon and attack painted surfaces on your vehicle. This damage can take two forms: blotchy, ringlet-shaped discolorations, and small irregular dark spots etched into the paint surface.

Although no defect in the factory applied paint causes this, Chevrolet will repair, at no charge to the owner, the painted surfaces of new vehicles damaged by this fallout condition within 12 months or 12,000 miles of purchase, whichever comes first.

13

GMCC000091436

## Warranty Coverage — Extensions

**Time Extensions:** The New Vehicle Limited Warranty will be extended one day for each day beyond the first 24 hour period in which your vehicle is at an authorized dealer facility for warranty service. You may be asked to show the repair orders to verify the period of time the warranty is to be extended. Your extension rights may vary depending on state law.

**Mileage Extensions:** Prior to delivery, some mileage is put on your vehicle during testing at the assembly plant, during shipping and while at the dealer facility. The dealer records this mileage on the first page of this warranty booklet at delivery. For eligible vehicles, this mileage will be added to the mileage limits of the warranty ensuring that you receive full benefit of the coverage. Mileage extension eligibility:

- Applies only to new vehicles held exclusively in new vehicle inventory.
- Does not apply to used vehicles, GM owned vehicles, dealer owned used vehicles, or dealer demonstrator vehicles.
- Does not apply to vehicles with more than 1,000 miles on the odometer even though the vehicle may not have been "registered" for license plates.

## Warranty Service — United States and Canada

For your records, the servicing dealer should provide a copy of the Warranty Repair Order listing all warranty repairs performed. While any Chevrolet dealer will perform warranty service, we recommend that you return to the Chevrolet dealer that sold you your vehicle because of their continued and personal interest in you. If you are traveling or have changed your residence, visit any Chevrolet dealer in the United States or Canada for warranty service.

## Touring Owner Service — Foreign Countries

If you are touring in a foreign country and repairs are needed, it is suggested you take your vehicle to a General Motors dealer facility which sells and services Chevrolets. Once you return to the United States, for reimbursement consideration, you should provide your dealer with a statement of circumstances, the original repair order, proof of ownership, and any "paid" receipt indicating the work performed and parts replaced. Please note that repairs made necessary by the use of improper or dirty fuels and lubricants are not covered under the warranty. See your Owner's Manual for additional information on fuel requirements when operating in foreign countries.

14

GMCC000091437

## Warranty Service — Foreign Countries

This warranty applies to GM vehicles registered in the United States and normally operated in the United States or Canada. If you have permanently relocated and established household residency in another country, GM may authorize the performance of repairs under the warranty authorized for vehicles generally sold by GM in that country. Contact an authorized GM dealer in your country for assistance. GM warranty coverages are voided on GM vehicles that have been imported / exported for resale.

## Original Equipment Alterations

This warranty does not cover any damage or failure resulting from modification or alteration to the vehicle's original equipment as manufactured or assembled by General Motors. Examples of the types of alterations that would not be covered include, installation or use of any non-GM part, accessory, materials, or the cutting, welding, or disconnecting of the vehicle's original equipment parts and components.

## Recreation Vehicle and Special Body or Equipment Alterations

Installations, or alterations to the original equipment vehicle (or chassis) as manufactured and assembled by General Motors, are not covered by this warranty. The special body company (assembler) or equipment installer is solely responsible for warranties on the body or equipment and any alterations to any of the parts, components, systems or assemblies installed by GM. Examples include, but are not limited to, special body installation (such as recreational vehicles), the installation of a non-GM part, cutting, welding or the disconnecting of original equipment vehicle or chassis parts and components, extension of wheelbase, suspension and driveline modifications and axle additions.

15

GMCC000091438

### Pre-Delivery Service

Defects in the mechanical, electrical, sheet metal, paint, trim, and other components of your vehicle may occur at the factory or while it is being transported to the dealer facility. Normally, any defects occurring during assembly are detected and corrected at the factory during the inspection process. In addition, dealers are obligated to inspect each vehicle before delivery. They repair any uncorrected factory defects and any transit damage detected before the vehicle is delivered to you.

Any defects still present at the time the vehicle is delivered to you are covered by the warranty. If you find any such defects when you take delivery, please advise your dealer without delay. For further details concerning any repairs which the dealer may have made prior to your taking delivery of your vehicle, please ask your dealer.

### Production Changes

General Motors Corporation and GM dealers reserve the right to make changes in vehicles built and/or sold by them at any time without incurring any obligation to make the same or similar changes on vehicles previously built and/or sold by them.

### Noise Emissions Warranty Light Trucks Over 10,000 LBS. GVWR Only

General Motors Corporation warrants to the first person who purchases this vehicle for purposes other than resale and to each subsequent purchaser of this vehicle, as manufactured by GM, was designed, built and equipped to conform at the time it left GM's control with all applicable United States EPA Noise Control Regulations.

This warranty covers this vehicle as designed, built and equipped by GM, and is not limited to any particular part, component or system of the vehicle manufactured by GM. Defects in design, assembly or in any part, component or vehicle system as manufactured by GM, which, at the time it left GM's control, caused noise emissions to exceed Federal standards, are covered by this warranty for the life of the vehicle.

**16**

GMCC000091439

# 1999 Emission Control Systems Warranties

This section outlines the emission warranties that General Motors provides for your vehicle in accordance with the U.S. Federal Clean Air Act. Defects in material or workmanship in GM emission parts may also be covered under the New Vehicle Limited Warranty Bumper-to-Bumper coverage. There may be additional coverage on GM diesel engine vehicles. In any case, the warranty with the broadest coverage applies.

## What Is Covered

The parts covered under the emission warranty are listed under Emission Warranty Parts List on pages 21 through 24.

## How to Determine the Applicable Emissions Control System Warranty

State and Federal agencies may require different emissions control systems warranties for light duty trucks depending on:

- Whether the truck is certified with a light or heavy duty emission control system. and/or
- Whether the truck is certified for California emissions in addition to Federal emissions.

Do the Following to determine emissions eligibility:

1. Locate the underhood emission control label located inside the engine compartment on the underside of the hood, on the air cleaner assembly, or on the engine.

2. The language on the bottom left side of the label will describe if equipped with a light, medium, or heavy duty emission control system.

3. All Light Duty Trucks are eligible for Federal Emissions Warranty Coverage. If the emissions control label contains language stating the vehicle is certified to California emissions standards, the vehicle is also eligible for California Emissions Warranty Coverage.

17

GMCC000091440

## 1. Federal Emission Control Warranty

Both the Emission Defect Warranty and the Emission Performance Warranty described below begin on the date the vehicle is first delivered or put into use and continues as follows:

**Light Duty Truck Equipped With Light Duty Gasoline or Diesel Engine**

- 2 years or 24,000 miles, and 8 years or 80,000 miles on the catalytic converter and vehicle (powertrain) control module, whichever comes first.

**Light Duty Truck Equipped With Heavy Duty Gasoline Engine**

- 5 years or 50,000 miles, whichever comes first.

**Light Duty Truck Equipped With Heavy Duty Diesel Engine**

- 5 years or 100,000 miles, whichever comes first.

### Emission Defect Warranty

General Motors Corporation warrants to the owner that the vehicle:

- was designed, equipped, and built so as to conform at the time of sale with applicable regulations of the Federal Environmental Protection Agency (EPA), and

- is free from defects in materials and workmanship which cause the vehicle to fail to conform with those regulations during the emission warranty period.

Emission related defects in the genuine GM parts listed under Emission Parts Covered, including related diagnostic costs, parts and labor are covered by this warranty.

### Emission Performance Warranty

Some states and/or local jurisdictions have established periodic vehicle Inspection and Maintenance (I/M) programs to encourage proper maintenance of your vehicle. If an EPA-approved I/M program is required in your area you may also be eligible for Emission Performance Warranty coverage when all of the following three conditions are met:

- The vehicle has been maintained and operated in accordance with the instructions for proper maintenance and use set forth in the Owner's Manual or Maintenance Schedule supplied with your vehicle.

- The vehicle fails an EPA-approved I/M test during the emission warranty period.

- The failure results, or will result, in the owner of the vehicle having to bear a penalty or other sanctions (including the denial of the right to use the vehicle) under local, state, or federal law.

18

GMCC000091441

If all these conditions are met, GM warrants that your dealer will replace, repair, or adjust to GM specifications, at no charge to you, any of the parts listed on pages 21 through 24 which may be necessary to cause your vehicle to conform to the applicable emission standards. Non-GM parts labeled "Certified to EPA Standards" are covered by the Emission Performance Warranty.

## 2. California Emission Control Warranty

This section outlines the emission warranties that General Motors provides for your vehicle in accordance with the California Air Resources Board. Defects in material or workmanship in GM emission parts may also be covered under the New Vehicle Limited Warranty Bumper-to-Bumper coverage. There may be additional coverage on GM diesel engine vehicles. In any case, the warranty with the broadest coverage applies.

The California Emission Control Warranty applies for vehicles certified for sale in California or other states adopting California emission regulations* as indicated on the vehicle's underhood emission control label.

* Currently Connecticut, Delaware, District of Columbia, Maryland, Massachusetts, New Hampshire, New Jersey, New York, Pennsylvania, Rhode Island, and Virginia.

### Your Rights and Obligations (For Vehicles Subject to California Exhaust Emission Standards)

The California Air Resources Board and General Motors are pleased to explain the emission control system warranty on your 1999 vehicle. In California, new motor vehicles must be designed, equipped, and built to meet the states' stringent anti-smog standards. GM must warrant your vehicle's emission control system for the periods of time and mileage listed on page 18 provided there has been no abuse, neglect, or improper maintenance of your vehicle. Your vehicle's emission control system may include parts such as the fuel injection system, ignition system, catalytic converter, and engine computer. Also included are hoses, belts, connectors, and other emission related assemblies.

19

GMCC000091442

Where a warrantable condition exists, GM will repair your vehicle at no cost to you including diagnosis, parts and labor.

**General Motors Warranty Coverage:**

- For trucks with light duty or medium duty emissions:

  - For 3 years or 50,000 miles, whichever comes first:

    If your vehicle fails a Smog Check inspection, GM will make all necessary repairs and adjustments to ensure that your vehicle passes the inspection. This is your vehicle emission control system Performance Warranty.

    If any emission related part on your vehicle is defective, GM will repair or replace it. This is your short-term emission Defects Warranty.

  - For 7 years or 70,000 miles, whichever comes first:

    If an emission related part listed in your vehicle warranty booklet specially noted with coverage for 7 years or 70,000 miles is defective, GM will repair or replace it. This is your long-term emission control system Defects Warranty.

- For heavy duty gasoline engine vehicles, the emission warranty period is 5 years or 50,000 miles, whichever comes first.

- For heavy duty diesel engine vehicles, the emission warranty period is 5 years, or 100,000 miles, or 3,000 hours of operation, whichever comes first.

Any authorized Chevrolet dealer will, as necessary under these warranties, replace, repair, or adjust to General Motors specifications any genuine GM parts that affect emissions.

The applicable warranty period shall begin on the date the vehicle is delivered to the first retail purchaser or, if the vehicle is first placed in service as a demonstrator or company vehicle prior to sale at retail, on the date the vehicle is placed in such service.

**Owner's Warranty Responsiblilties:**

As the vehicle owner, you are responsible for the performance of the scheduled maintenance listed in your Owner's Manual/Maintenance Schedule. GM recommends that you retain all maintenance receipts for your vehicle, but GM cannot deny warranty solely for the lack of receipts or for your failure to ensure the performance of all scheduled maintenance.

20

GMCC000091443

You are responsible for presenting your vehicle to a GM dealer selling your vehicle line as soon as a problem exists. The warranted repairs should be completed in a reasonable amount of time, not to exceed 30 days.

As the vehicle owner, you should also be aware that GM may deny you warranty coverage if your vehicle or a part has failed due to abuse, neglect, improper or insufficient maintenance, or modifications not approved by GM.

If you have any questions regarding your rights and responsibilities under these warranties, you should contact the Customer Assistance Center at 1-800-222-1020 or, in California, the State of California Air Resources Board, Mobile Source Operations Division, P.O. Box 8001, El Monte, California 91731-2990.

**What Is Covered**

The parts covered under the Emission Control Systems Warranties are listed under the Emission Warranty Parts List.

**What Is Not Covered**

The Emission Control Systems Warranties obligations do not apply to conditions resulting from tampering, abuse, neglect, or improper maintenance; or any other item listed under "What Is Not Covered" in the New Vehicle Limited Warranty on pages 9, 10 and 11. The "Other Terms" presented in the New Vehicle Limited Warranty also apply to the emission related warranties.

**3. Emission Warranty Parts List**

The parts that may affect your vehicle's emissions are on the following pages. These emission parts are covered under emission warranties as follows:

- **Federal coverage**– refer to page 17.
- **California coverage**– refer to page 19.

NOTE: Certain parts may be covered beyond these warranties if shown with asterisk(s) as follows:

- (*) 7 years/70,000 miles, whichever comes first, California emission coverage.
- (**) 8 years/80,000 miles, whichever comes first, Federal emission coverage.

21

GMCC000091444

**Powertrain Control System**
- Barometric Pressure Sensor
- Brake Switch
- Camshaft Position Sensor
- Coolant Fan Control Relay
- Coolant Level Sensor
- Crankshaft Position Sensor
- Data Link Connector
- Electric Throttle Control (ETC) Motor
- Engine Control Module (ECM)* ** [Tracker Only]
- Engine Coolant Temp. Sensor
- Fast Idle Solenoid
- Intake Air Temperature Sensor
- Malfunction Indicator Lamp
- Manifold Absolute Pressure Sensor
- Manual Transmission Clutch Switch (60° V6 only)
- Mass Air Flow Sensor*
- Oxygen Sensors
- Park/Neutral Position Switch
- Powertrain Control Module (PCM)**
- Programmable Read Only Memory (PROM)
- Throttle Position Sensor
- Throttle Position Switch
- Torque Converter Clutch Switch
- Torque Converter Clutch Solenoid Valve
- Transmission Speed Sensors
- Vehicle Control Module (VCM)**
- Vehicle Speed Sensor

**Fuel Management System**
- Altitude Fuel Limiter (Diesels)
- Diesel Fuel Injection Pump
- Diesel Fuel Inj. Pump Timing Adj.
- Fuel Injectors
- Fuel Pressure Regulator
- Fuel Rail Assembly*
- Diesel Glow Plugs

22

GMCC000091445

## Air Management System

Air Cleaner
Air Cleaner Diaphragm Motor
Air Cleaner Resonator
Air Cleaner Temp. Compensator Valve
Air Flow Meter* [Tracker Only]
Air Intake Ducts
Charge Air Control Actuator
Charge Air Control Solenoid Valve
Charge Air Control Valve
Charge Air Cooler
Charge Air Cooler Fan
Charge Air System

Idle Air Control Valve
Idle Speed Control Motor
Intake Manifold*
Intake Manifold Tuning Valve
Intake Manifold Tuning Valve Relay
Supercharger Assembly*
Throttle Body Assembly*
Throttle Body Heater
Throttle Closing Dashpot
Turbocharger*
Turbocharger Oil Separator
Turbocharger Thermo Purge Switch

## Ignition System

Distributor*
Distributor Cap
Distributor Pick Up Coil
Distributor Rotor
Ignition Coil

Ignition Control Module*
Ignition Timing Adjustment
Knock Sensor System
Spark Plug Wires
Spark Plugs

## Catalytic Converter System

Catalytic Converter* **
Exhaust Manifold*

Exhaust pipes and/or Mufflers (when located
   between converter and exhaust manifold)

## Positive Crankcase Ventilation System

Diesel Crankcase Depression Regulator Valve
Oil Filler Cap
PCV Filter

PCV Oil Separator
PCV Valve

23

GMCC000091446

### Exhaust Gas Recirculation System

EGR Control Valves
EGR Passages
EGR Temperature Sensor
EGR Thermal Vacuum Valve
EGR Vacuum Pump (Diesel Only)
EGR Valve

EGR Valve and Exhaust Press. Regulator Solenoid
  Valve (diesels only)
EGR Valve Relay
Exhaust Backpressure Transducer
Exhaust Pressure Regulator Valve and
  Actuator (diesels only)

### Secondary Air Injection System

Air Pump
Bypass Valve
Check Valves
Deceleration Valve

Injection Check Valve
Pump Belt
Switching Valves
Vacuum Delay Valve

### Evaporative Emission Control System (Gasoline Engines)

Canister
Canister Control Valve
Canister Vent Solenoid
Canister Purge Solenoid Valve
Canister Purge Thermal Vacuum Valve
Fuel Feed and Return Pipes and Hoses

Fuel Filler Cap
Fuel Tank Filler Pipe (with restrictor)
Fuel Tank Pressure Control Valve
Fuel Tanks*
Fuel Tank Vacuum Sensor
Purge Line Vacuum Switch

### Miscellaneous Items Used in Above Systems

| Actuators | Ducts | Hoses | Pipes | Sensors | Tubes |
|-----------|-------|-------|-------|---------|-------|
| Belts | Fittings | Housings | Pulleys | Springs | Valves |
| Clamps | Gaskets | Mounting | Relays | Switches | Wiring |
| Connectors | Grommets | Hardware | Sealing Devices | | |

\* 7 years/70,000 miles, whichever comes first, California emission coverage.
\*\* 8 years/80,000 miles, whichever comes first, Federal emission coverage.

24

GMCC000091447

Parts specified in your maintenance schedule as requiring scheduled replacement are covered up to their first replacement interval or the applicable emission warranty coverage period, whichever comes first. If failure of one of these parts results in failure of another part, both will be covered under the Emission Control System warranties.

For trucks equipped with the California light duty or medium duty emission systems, items marked with an asterisk are covered by the California long-term emission control system Defects Warranty for 7 years/70,000 miles. (For example, if one of these parts causes a Smog Check failure after the 3-year/50,000-mile performance warranty has expired, the part is still covered for 7 years/70,000 miles.)

For detailed information concerning specific parts covered by these emission control systems warranties, ask your dealer.

## 4. Things You Should Know About the Emission Control Systems Warranties

### Replacement Parts

The emission control systems of your vehicle were designed, built, and tested using genuine GM parts▼ and the vehicle is certified as being in conformity with applicable federal and California emission requirements. Accordingly, it is recommended that any replacement parts used for maintenance or for the repair of emission control systems be new, genuine GM parts.

The warranty obligations are not dependent upon the use of any particular brand of replacement parts. The owner may elect to use non-genuine GM parts for replacement purposes. Use of replacement parts which are not of equivalent quality may impair the effectiveness of emission control systems.

If other than new, genuine GM parts are used for maintenance replacements or for the repair of parts affecting emission control, the owner should assure himself/herself that such parts are warranted by their manufacturer to be equivalent to genuine GM parts in performance and durability.

▼ "genuine GM parts," when used in connection with GM vehicles means parts manufactured by or for GM, designed for use on GM vehicles and distributed by any division or subsidiary of General Motors Corporation.

### Maintenance and Repairs

Maintenance and repairs can be performed by any qualified service outlet; however, warranty repairs must be performed by an authorized dealer except in an emergency situation when a warranted part or a warranty station is not reasonably available to the vehicle owner.

In an emergency, where an authorized dealer is not reasonably available, repairs may be performed at any available service establishment or by the owner, using any replacement part. Chevrolet will consider reimbursement for the expense incurred (including diagnosis), not to exceed the manufacturer's suggested

25

GMCC000091448

retail price for all warranted parts replaced and labor charges based on Chevrolet's recommended time allowance for the warranty repair and the geographically appropriate labor rate. A part not being available within 10 days or a repair not being completed within 30 days constitutes an emergency. Retain receipts and failed parts in order to receive compensation for warranty repairs reimbursable due to an emergency.

If, in an emergency situation, it is necessary to have repairs performed by other than a Chevrolet dealer and you believe the repairs are covered by emission warranties, take the replaced parts and your receipt to a Chevrolet dealer for reimbursement consideration. This applies to both the Emission Defect Warranty and Emission Performance Warranty.

Receipts and records covering the performance of regular maintenance or emergency repairs should be retained in the event questions arise concerning maintenance. These receipts and records should be transferred to each subsequent owner. GM will not deny warranty coverage solely on the absence of maintenance records. However, GM may deny a warranty claim if a failure to perform scheduled maintenance resulted in the failure of a warranty part.

**Claims Procedure**

As with the other warranties covered in this booklet, take your vehicle to any authorized Chevrolet dealer facility to obtain service under the emission warranties.

This should be done as soon as possible after failing an EPA-approved Inspection/Maintenance test or a California Smog Check test, or at any time you suspect a defect in a part.

Those repairs qualifying under the warranty will be performed by any Chevrolet dealer at no charge. Repairs which do not qualify will be charged to you. You will be notified as to whether or not the repair qualifies under the warranty within a reasonable time (not to exceed 30 days after receipt of the vehicle by the dealer, or within the time period required by local or state law).

The only exceptions would be if you request or agree to an extension, or if a delay results from events beyond the control of your dealer or GM. If you are not so notified, GM will provide any required repairs at no charge. In the event a warranty matter is not handled to your satisfaction, refer to the Customer Satisfaction Procedure in this booklet under "Owner Assistance" on page 27.

For further information or to report violations of the emission control systems warranties, you may contact the Manager, Vehicle Compliance Program Group, Environmental Protection Agency, 401 "M" Street, S.W., Washington, DC 20460.

For a vehicle subject to the California Exhaust Emission standards, you may contact the State of California Air Resources Board, Mobile Source Operations Division, P.O. Box 8001, El Monte, California 91731-2990.

26

GMCC000091449

## Owner Assistance

### Customer Satisfaction Procedure

Your satisfaction and goodwill are important to your dealer and to Chevrolet. Normally, any concerns with the sales transaction or the operation of your vehicle will be resolved by your dealer's Sales or Service Departments. Sometimes, however, despite the best intentions of all concerned, misunderstandings can occur. If your concern has not been resolved to your satisfaction, the following steps should be taken:

**STEP ONE — Discuss your concern with a member of dealer management.** Normally, concerns can be quickly resolved at that level. If the matter has already been reviewed with the Sales, Service, or Parts Manager, **contact the owner of the dealer facility or the General Manager.**

**STEP TWO —** If after contacting a member of dealer management, it appears your concern cannot be resolved by the dealer without further help **contact the Chevrolet Customer Assistance Center** by calling 1-800-222-1020. (In Canada, contact GM of Canada Central Office in Oshawa by calling 1-800-263-3777: English, or 1-800-263-7854: French).

We encourage you to call the toll-free number in order to give your inquiry prompt attention. Please have the following information available to give the Customer Assistance Representative:

- Vehicle Identification Number (This is available from the vehicle registration or title, or the plate above the left top of the instrument panel and visible through the windshield.)

- Dealer name and location

- Vehicle's delivery date and present mileage

When contacting Chevrolet, please remember that your concern will likely be resolved at a dealer's facility. That is why we suggest you follow Step One first if you have a concern.

**STEP THREE —** Both General Motors and your GM dealer are committed to making sure you are completely satisfied with your new vehicle. However, if you continue to remain unsatisfied after following the procedure outlined in Steps One and Two, you must file with the GM/BBB Auto Line Program to enforce any additional rights you may have.

27

GMCC000091450

The BBB Auto Line program is an out of court program administered by the Council of Better Business Bureaus to settle automotive disputes regarding vehicle repairs or the interpretation of the New Vehicle Limited Warranty. Although you are required to resort to this informal dispute resolution program prior to filing any court action, use of the program is free of charge and your case will generally be heard within 40 days. If you do not agree with the decision given in your case, you may reject it and proceed with any other venue for relief available to you.

You may contact the BBB using the toll-free telephone number or write them at the following address:

BBB Auto Line
Council of Better Business Bureaus, Inc.
4200 Wilson Boulevard
Suite 800
Arlington, VA 22203-1804

Telephone: 1-800-955-5100

This program is available in all 50 states and the District of Columbia. Eligibility is limited by vehicle age, mileage and other factors. General Motors reserves the right to change eligibility limitations and/or to discontinue its participation in this program.

## Assistance For Text Telephone (TTY) Users

To assist customers who are deaf or hard of hearing and who use Text Telephones (TTYs), Chevrolet has TTY equipment available at its Customer Assistance Center and Roadside Assistance Center.

The TTY for the Chevrolet Customer Assistance Center is:
1-800-833-2438 in the United States
1-800-263-3830 in Canada

The TTY for the Chevrolet Roadside Assistance Center is:
1-888-TTY-CHEV (889-2438) in the
U.S. and Canada

## Chevrolet Roadside Assistance

Chevrolet is proud to offer the response, security and convenience of Chevrolet's 24-hour Roadside Assistance Program. Please refer to your Owner's Manual for details, or consult your dealer. The Chevrolet Roadside Assistance Center can be reached by calling 1-800 CHEV-USA (243-8872). This program is not available in Puerto Rico or the U.S. Virgin Islands.

28

GMCC000091451



## Chevrolet Courtesy Transportation

During the Bumper-to-Bumper warranty coverage period, interim transportation may be available under the Chevrolet Courtesy Transportation Program. Please consult your dealer for details.

## State Warranty Enforcement Laws

Laws in many states permit owners to obtain a replacement vehicle or a refund of the purchase price under certain circumstances. The provisions of these laws vary from state to state. To the extent allowed by state law, General Motors requires that you first provide us with written notification of any service difficulty you have experienced so that we have an opportunity to make any needed repairs before you are eligible for the remedies provided by these laws. Your written notification should be sent to the Chevrolet Customer Assistance Center. Please see page 30 for the address.

## Special Policy Adjustment Programs Beyond the Warranty Period

Chevrolet is proud of the protection afforded by its warranty coverages. In order to achieve maximum customer satisfaction, there may be times when Chevrolet will establish a special policy adjustment program to pay all or part of the cost of certain repairs not covered by the warranty or to reimburse certain repair expenses you may have incurred. Check with your Chevrolet dealer or call the Chevrolet Customer Assistance Center to determine whether any special policy adjustment program is applicable to your vehicle.

When you make an inquiry, you will need to give the year, model and mileage of your vehicle and your Vehicle Identification Number (VIN).

29

GMCC000091452

## Customer Assistance Offices

Chevrolet encourages customers to call the toll-free number for assistance. If a U.S. customer wishes to write to Chevrolet, the letter should be addressed to Chevrolet's Customer Assistance Center in Troy, Michigan.

### United States

Chevrolet Motor Division
Customer Assistance Center
P.O. Box 7047
Troy, MI 48007-7047
1-800-222-1020
1-800-833-2438 (For Text Telephone devices (TTYs))
Roadside Assistance:
1-800 CHEV-USA (243-8872)

### Canada

Customer Assistance Centre, 163-005
General Motors of Canada Limited
1908 Colonel Sam Drive
Oshawa, Ontario L1H 8P7
1-800-263-3777 (English)
1-800-263-7854 (French)
1-800-263-3830 (For Text Telephone devices (TTYs))
Roadside Assistance: 1-800-268-6800

### All Overseas Locations

Customer Communication Center
General Motors Overseas Distribution Corp.
1908 Colonel Sam Drive
Oshawa, Ontario, CANADA L1H 8P7
Telephone: 905-644-4112
Fax:          905-644-4866
Internet Address:
    LNCAHUB.GMODCC@GMEDS.COM

### Caribbean Numbers

1-800-496-9992 (English) Puerto Rico
1-800-496-9993 (Spanish) Puerto Rico
1-800-751-4135 (English) Dominican Republic
1-800-751-4136 (Spanish) Dominican Republic
1-800-496-9994 U.S. Virgin Islands
1-800-389-0009 Bahamas
1-800-534-0122 Bermuda, Barbados, Antigua & B.V.I.

If toll free service is not available in the Caribbean, call Puerto Rico 1-787-763-1315.

30

**Don't Wait Until Your New Vehicle Limited Warranty - and Your Opportunity to Purchase the GM Protection Plan - Expire.**

Learn how to protect yourself, with the GM Protection Plan, against costly repairs after your new vehicle limited warranty expires. A monthly payment plan makes it convenient and affordable. Just call or mail this request and you'll find out how you can get the security of knowing you're covered if something breaks down.



**No-Obligation GM Protection Information Request**

☐ **YES!** Please send me free information about how I can protect myself from costly repair bills after my new vehicle limited warranty expires.

Name: _____

Address: _____ Apt#: _____

City: _____ State: _____ Zip: _____

Daytime Phone: ( ) _____ Evening Phone: ( ) _____

**Vehicle Information**

Vehicle Identification Number *(17 Digits)*

_____

Make/Model: _____ Year: _____

Purchase Date: _____ Mileage: _____

Complete and mail this request today and we'll send you FREE details about how you can add years and miles of protection.

**Mail to:** **GM Protection Plan**
P.O. Box 02968
Detroit, MI 48202

**Or call 800-981-4677 toll-free for details today.**

31

GMCC000091454

**32**

GMCC000091455



GMCC000091456

0003410



GMCC000085506



... to every
1999 Blazer
under warranty
with the
following services:

**Bumper-to-Bumper**
**3 years/36,000 miles**
**(60,000 km)**
**Limited Warranty**

**Courtesy**
**Transportation**

*24-hour*
*Roadside Assistance*
*1-800-CHEV-USA*
*(In Canada, call 1-800-268-6800)*
*that provides in an emergency:*

- Free lockout assistance
- Free dead-battery assistance
- Free out-of-fuel assistance
- Free flat-tire change
- Emergency Towing

GMCC000085507



GMCC000085508





| | | |
|---|---|---|
| | Page 2-5 | Rear Window Wiper ... Page 2-4 |
| | Page 2-1 | Cruise Control Button Page 2-4 |
| | Page 2-1 | Turning on Headlamps |
| | Page 2-1 | Other Lamps Page 2-4 |
| Rear Defrost | Page 2-1 | Fog Lamp Control Page 2-5 |
| | Page 2-1 | Power Remote Control |
| High-Beam Beams | Page 2-3 | Mirror Control |
| | | Warning Lights and Gauges Page 2-7 |
| | Page 2-3 | Rear Window Defroster button Page 3-8 |

| | |
|---|---|
| AM-FM Stereo | Page 3-10 |
| AM-FM Stereo with Cassette | Page 3-12 |
| AM-FM Stereo with Cassette & Auto tone Control | Page 3-15 |
| AM-FM Stereo with Cassette (Bose) | Page 3-20 |
| AM-FM Stereo with CD & Auto Tone Control | Page 3-24 |
| AM-FM Stereo with Compact Disc Player (Bose) | Page 3-28 |
| Remote Cassette Player | Page 3-32 |
| Console Mounted CD Changer | Page 3-34 |
| Audio Steering Controls | Page 3-40 |
| Rear Reference Feature | Page 3-37 |

GMCC000085509



Section 1

...so you never get into trouble on the road...
...a few of the most common problems that get...

...to turn on your hazard warning flashers          Page 5-2
...to jump start your vehicle                        Page 5-3
...if your vehicle should be towed                   Page 5-7
...what to do when your engine overheats             Page 5-9
...how to change a flat tire                         Page 5-20

Section 2

Remote Keyless Entry (RKE)          Page 2-6
Content Theft Deterrent             Page 2-13
Engine Coolant Heater               Page 2-20
4WD Transfer Case                   Page 2-26
Temperature & Compass Display       Page 2-58
Accessory Outlets                   Page 2-67
Sunroof                             Page 2-67
Universal Transmitter               Page 2-68

# The 1999 Chevrolet Blazer Owner's Manual

**1-1**   **Seats and Restraint Systems**
This section tells you how to use your seats and safety belts properly. It also explains the air bag system.

**2-1**   **Features and Controls**
This section explains how to start and operate your vehicle.

**3-1**   **Comfort Controls and Audio Systems**
This section tells you how to adjust the ventilation and comfort controls and how to operate your audio system.

**4-1**   **Your Driving and the Road**
Here you'll find helpful information and tips about the road and how to drive under different conditions.

**5-1**   **Problems on the Road**
This section tells you what to do if you have a problem while driving, such as a flat tire or overheated engine, etc.

**6-1**   **Service and Appearance Care**
Here the manual tells you how to keep your vehicle running properly and looking good.

**7-1**   **Maintenance Schedule**
This section tells you when to perform vehicle maintenance and what fluids and lubricants to use.

**8-1**   **Customer Assistance Information**
This section tells you how to contact Chevrolet for assistance and how to get service and owner publications.
It also gives you information on "Reporting Safety Defects" on page 8-10.

**9-1**   **Index**
Here's an alphabetical listing of almost every subject in this manual. You can use it to quickly find
something you want to read.

i

GMCC000085511





We support voluntary
technician certification.

WE SUPPORT
VOLUNTARY TECHNICIAN
CERTIFICATION THROUGH

National Institute for
**AUTOMOTIVE
SERVICE
EXCELLENCE**

GENERAL MOTORS, GM, the GM Emblem,
CHEVROLET, the CHEVROLET Emblem and the
name BLAZER are registered trademarks of General
Motors Corporation.

This manual includes the latest information at the time it
was printed. We reserve the right to make changes in the
product after that time without further notice. For
vehicles first sold in Canada, substitute the name
"General Motors of Canada Limited" for Chevrolet
Motor Division whenever it appears in this manual.

Please keep this manual in your vehicle, so it will be
there if you ever need it when you're on the road. If you
sell the vehicle, please leave this manual in it so the new
owner can use it.

## For Canadian Owners Who Prefer a French Language Manual:

**Aux propriétaires canadiens:** Vous pouvez vous
procurer un exemplaire de ce guide en français chez
votre concessionaire ou au:

DGN Marketing Services Ltd.
1577 Meyerside Dr.
Mississauga, Ontario L5T 1B9

Litho in U.S.A.
C9911 A First Edition

©Copyright General Motors Corporation 1998
All Rights Reserved

ii

GMCC000085512

# Section 6   Service and Appearance Care

Here you will find information about the care of your vehicle. This section begins with service and fuel information, and then it shows how to check important fluid and lubricant levels. There is also technical information about your vehicle, and a part devoted to its appearance care.

| | | | |
|---|---|---|---|
| 6-2 | Service | 6-29 | Brakes |
| 6-3 | Fuel | 6-33 | Battery |
| 6-5 | Fuels in Foreign Countries | 6-34 | Bulb Replacement |
| 6-5 | Filling Your Tank | 6-39 | Windshield Wiper Blade Replacement |
| 6-7 | Filling a Portable Fuel Container | 6-41 | Tires |
| 6-8 | Checking Things Under the Hood | 6-49 | Appearance Care |
| 6-10 | Engine Oil | 6-50 | Cleaning the Inside of Your Vehicle |
| 6-15 | Engine Air Cleaner/Filter | 6-52 | Care of Safety Belts |
| 6-16 | Automatic Transmission Fluid | 6-53 | Cleaning the Outside of Your Vehicle |
| 6-19 | Manual Transmission Fluid | 6-57 | GM Vehicle Care/Appearance Materials |
| 6-20 | Hydraulic Clutch | 6-58 | Vehicle Identification Number (VIN) |
| 6-21 | Rear Axle | 6-58 | Service Parts Identification Label |
| 6-22 | Four-Wheel Drive | 6-59 | Electrical System |
| 6-24 | Radiator Pressure Cap | 6-65 | Replacement Bulbs |
| 6-24 | Thermostat | 6-65 | Capacities and Specifications |
| 6-24 | Engine Coolant | 6-66 | Air Conditioning Refrigerants |
| 6-27 | Power Steering Fluid | 6-66 | Normal Maintenance Replacement Parts |
| 6-28 | Windshield Washer Fluid | | |

**6-1**

## Radiator Pressure Cap



<div style="border:1px solid;">

**NOTICE:**

Your radiator cap is a 15 psi (105 kPa)
pressure-type cap and must be tightly installed to
prevent coolant loss and possible engine damage
from overheating. Be sure the arrows on the cap
line up with the overflow tube on the radiator
filler neck.

</div>

## Thermostat

Engine coolant temperature is controlled by a thermostat
in the engine coolant system. The thermostat stops the
flow of coolant through the radiator until the coolant
reaches a preset temperature.

## Engine Coolant

The cooling system in your vehicle is filled with
DEX-COOL® engine coolant. This coolant is designed
to remain in your vehicle for 5 years or 150,000 miles
(240 000 km), whichever occurs first, if you add only
DEX-COOL® extended life coolant.

The following explains your cooling system and how
to add coolant when it is low. If you have a problem
with engine overheating, see "Engine Overheating" in
the Index.

A 50/50 mixture of clean, drinkable water and
DEX-COOL® coolant will:

- Give freezing protection down to -34°F (-37°C).
- Give boiling protection up to 265°F (129°C).
- Protect against rust and corrosion.
- Help keep the proper engine temperature.
- Let the warning lights and gages work as they should.

6-24

GMCC000085820

## NOTICE:

**When adding coolant, it is important that you use only DEX-COOL® (silicate-free) coolant.**

**If coolant other than DEX-COOL is added to the system, premature engine, heater core or radiator corrosion may result. In addition, the engine coolant will require change sooner -- at 30,000 miles (50 000 km) or 24 months, whichever occurs first. Damage caused by the use of coolant other than DEX-COOL® is not covered by your new vehicle warranty.**

### What to Use

Use a mixture of one-half *clean, drinkable water* and one-half DEX-COOL® coolant which won't damage aluminum parts. If you use this coolant mixture, you don't need to add anything else.

## ⚠ CAUTION:

**Adding only plain water to your cooling system can be dangerous. Plain water, or some other liquid like alcohol, can boil before the proper coolant mixture will. Your vehicle's coolant warning system is set for the proper coolant mixture. With plain water or the wrong mixture, your engine could get too hot but you wouldn't get the overheat warning. Your engine could catch fire and you or others could be burned. Use a 50/50 mixture of clean, drinkable water and DEX-COOL® coolant.**

**6-25**

GMCC000085821

**Checking Coolant**



> ### NOTICE:
>
> **If you use an improper coolant mixture, your engine could overheat and be badly damaged. The repair cost wouldn't be covered by your warranty. Too much water in the mixture can freeze and crack the engine, radiator, heater core and other parts.**

If you have to add coolant more than four times a year, have your dealer check your cooling system.

> ### NOTICE:
>
> **If you use the proper coolant, you don't have to add extra inhibitors or additives which claim to improve the system. These can be harmful.**

The vehicle must be on a level surface. When your engine is cold, the coolant level should be at ADD, or a little higher. When your engine is warm, the level should be up to FULL HOT, or a little higher.

**Adding Coolant**

If you need more coolant, add the proper DEX-COOL® coolant mixture *at the coolant recovery tank.*

6-26

GMCC000085622

> ### ⚠ CAUTION:
>
> **Turning the radiator pressure cap when the engine and radiator are hot can allow steam and scalding liquids to blow out and burn you badly. With the coolant recovery tank, you will almost never have to add coolant at the radiator. Never turn the radiator pressure cap -- even a little -- when the engine and radiator are hot.**

Add coolant mixture at the recovery tank, but be careful not to spill it.

> ### ⚠ CAUTION:
>
> **You can be burned if you spill coolant on hot engine parts. Coolant contains ethylene glycol, and it will burn if the engine parts are hot enough. Don't spill coolant on a hot engine.**

## Power Steering Fluid



## When to Check Power Steering Fluid

It is not necessary to regularly check power steering fluid unless you suspect there is a leak in the system or you hear an unusual noise. A fluid loss in this system could indicate a problem. Have the system inspected and repaired.

GMCC000085823

# Section 7    Maintenance Schedule

This section covers the maintenance required for your vehicle. Your vehicle needs these services to retain its safety, dependability and emission control performance.

| | | | |
|---|---|---|---|
| 7-2 | Introduction | 7-40 | Part B: Owner Checks and Services |
| 7-4 | Part A: Scheduled Maintenance Services | 7-45 | Part C: Periodic Maintenance Inspections |
| 7-7 | Short Trip/City Scheduled Maintenance | 7-47 | Part D: Recommended Fluids and Lubricants |
| 7-28 | Long Trip/Highway Scheduled Maintenance | 7-50 | Part E: Maintenance Record |

**7-1**

GMCC000085863

## Part B: Owner Checks and Services

Listed in this part are owner checks and services which should be performed at the intervals specified to help ensure the safety, dependability and emission control performance of your vehicle.

Be sure any necessary repairs are completed at once. Whenever any fluids or lubricants are added to your vehicle, make sure they are the proper ones, as shown in Part D.

### At Each Fuel Fill

*It is important for you or a service station attendant to perform these underhood checks at each fuel fill.*

**Engine Oil Level Check**

Check the engine oil level and add the proper oil if necessary. See "Engine Oil" in the Index for further details.

**Engine Coolant Level Check**

Check the engine coolant level and add DEX-COOL® coolant mixture if necessary. See "Engine Coolant" in the Index for further details.

**Windshield Washer Fluid Level Check**

Check the windshield washer fluid level in the windshield washer tank and add the proper fluid if necessary. See "Windshield Washer Fluid" in the Index for further details.

### At Least Once a Month

**Tire Inflation Check**

Make sure tires are inflated to the correct pressures. See "Tires" in the Index for further details.

**Cassette Deck Service**

Clean cassette deck. Cleaning should be done every 50 hours of tape play. See "Audio Systems" in the Index for further details.

7-40

GMCC000085902